1 | Robert A. Sacks (SBN 150146)
sacksr@sullcrom.com
2 | Orly Z. Elson (SBN 240645)
elsono@sullcrom.com
3 | SULLIVAN & CROMWELL LLP
1888 Century Park East, Suite 2100
4 | Los Angeles, California 90067-1725
Tel.: (310) 712-6600
5 | Fax: (310) 712-8800

6 | *Attorneys for Plaintiffs*
RICHARD RESSLER and
7 | ORCHARD CAPITAL CORPORATION

FILED
2010 MAY 20 PM 4:07
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY ___ NC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

RICHARD RESSLER, and
ORCHARD CAPITAL
CORPORATION,

Plaintiffs,

v.

VIETNAM MARITIME
COMMUNICATION AND
ELECTRONICS COMPANY, A
STATE-OWNED COMPANY OF
THE SOCIALIST REPUBLIC OF
VIETNAM,

Defendant.

Case No. **CV10-3836 PA (JCGx)**

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

I/S
21

L/N

Plaintiffs Richard Ressler ("Ressler") and Orchard Capital Corporation ("Orchard Capital"), by their attorneys, Sullivan & Cromwell LLP, for their Complaint against Vietnam Maritime Communication And Electronics Company ("Vishipel"), allege on knowledge as to themselves and their own conduct and upon information and belief as to all other matters as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs Richard Ressler and Orchard Capital Corporation bring this declaratory judgment action under 28 U.S.C. §2201 and Federal Rule of Civil Procedure 57. Plaintiffs, residents of this District, seek declaratory and injunctive relief to prevent Defendant Vishipel from proceeding with claims against them in an arbitration it has commenced in Singapore. Plaintiffs are not signatories to any arbitration agreement with Vishipel, never agreed to arbitrate any issues with Vishipel in Singapore, and cannot properly be compelled to arbitrate with Vishipel in Singapore.

2.      The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. Accordingly, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332.

3.      Venue is proper in this District under 28 U.S.C. § 1391. Many of the acts, including the joint business venture, that form the basis for Vishipel's arbitration before the Singapore International Arbitration Centre (the "SIAC"), which is the subject matter of this action, were conceived, carried out, and made effective in this District.

4.      Personal jurisdiction over Vishipel is proper in this District because Vishipel has done business in this District on a systematic and continuous basis and has availed itself of this Court by filing and maintaining a suit in this

1

District related to the subject matter of this action against Universal Telecom
Services, Inc. ("UTS") and Plaintiff Orchard Capital.

<b><u>PARTIES</u></b>

5.    Plaintiff Richard Ressler is an individual who is a citizen of the
United States and resides in this District.

6.    Plaintiff Orchard Capital Corporation is a California
corporation organized under the laws of the State of California, with its principal
place of business at 6922 Hollywood Boulevard, Suite 900, Hollywood, California.

7.    Defendant Vietnam Maritime Communication And Electronics
Company is a state-owned company of the Socialist Republic of Vietnam, with its
principal place of business at 2 Nguyen Thuong Hien Street, Minh Khai Ward,
Hong Bank District, Hai Phong City, Vietnam.

<b><u>FACTUAL BACKGROUND</u></b>

8.    On December 31, 2000, Vishipel, UTS and Binh Minh Trading
Company Ltd. ("Binh Minh") entered into a Business Cooperation Contract (the
"BCC") to develop, operate and maintain an internet telephone network that would
operate between the United States and Vietnam. (A true and correct copy of the
BCC is attached hereto as Exhibit A.)

9.    Section 19.2(a) of the BCC contains an arbitration clause that
provides:

> If the conciliation or negotiation to resolve a dispute fails to be
> resolved within ninety (90) days of a notice from a Party to any other
> Party that a Dispute exists discussions (sic), then any party may
> submit the matter for arbitration in accordance with the rules of
> UNCITRAL contained in Resolution 31/98 adopted by the United
> Nations General Assembly on 15 December 1976, which shall be
> administered by the Singapore International Arbitration Centre
> ("SIAC").

10.    Plaintiffs Ressler and Orchard Capital are not parties to the
BCC and did not sign the BCC. The BCC describes three parties: Party A, which
is defined as Vishipel; Party B, which is defined as Binh Minh; and Party C, which

-2-

is defined as UTS. Representatives of only these three parties, Vishipel, Binh Minh and UTS, signed the BCC.

11.     On or about July 23, 2009, Vishipel filed a Notice of Arbitration with the SIAC relating to a dispute arising out of the BCC. In its Notice of Arbitration, in addition to naming UTS and Binh Minh as Respondents, Vishipel improperly named Plaintiffs Ressler and Orchard Capital as Respondents. (A true and correct copy of the Notice of Arbitration is attached hereto as Exhibit B.)

12.     On July 29, 2009, Vishipel initiated an action in this District against UTS and Plaintiff Orchard Capital, seeking, among other things, the provisional remedies of a temporary protective order and a writ of attachment with respect to the same allegations that form the basis for its Singapore arbitration.

13.     On February 1, 2010, Vishipel voluntarily dismissed the District Court action after the Court denied its request for a temporary restraining order and writ of attachment. Vishipel did not seek or obtain any order that Ressler or Orchard Capital could be compelled to arbitrate in Singapore.

14.     On April 20, 2010, Vishipel submitted its Statement of Claim with the SIAC, again identifying UTS, Binh Minh, Plaintiff Ressler and Plaintiff Orchard Capital as Respondents. (A true and correct copy of the Statement of Claim is attached hereto as Exhibit C.)

15.     Vishipel asserts in both its Notice of Arbitration and its Statement of Claim that the amount in dispute is in excess of ten million dollars ($10,000,000).

16.     In its Statement of Claim, Vishipel seeks to hold Ressler and Orchard Capital liable for claims it has asserted against UTS, a party to the BCC.

17.     As non-signatories to the BCC, Ressler and Orchard Capital did not consent, and therefore cannot be compelled, to arbitrate in Singapore before the SIAC.

-3-

18.    In its Statement of Claim, Vishipel acknowledges that Ressler and Orchard Capital are not signatories to the BCC, yet asserts that they should be required to participate in the arbitration because: (i) they are alter egos of UTS; (ii) they are guarantors of UTS' obligations pursuant to the BCC; and (iii) "principles of efficiency and economy support resolution . . . in a single proceeding."

19.    An arbitrator does not have the power to determine the rights and obligations of an individual or entity that is not a party to an arbitration agreement. Only a court may determine whether, as non-signatories, Ressler and Orchard Capital may be compelled to participate in the Singapore arbitration.

20.    In addition, Plaintiffs are neither alter egos of UTS nor guarantors of any of UTS' obligations pursuant to the BCC. Moreover, even if Plaintiffs had guaranteed UTS' obligations pursuant to the BCC, this does not provide a basis for compelling Plaintiffs to arbitrate in Singapore.

21.    Through counsel, Ressler and Orchard Capital advised Vishipel that they are improperly named in the Singapore arbitration. Rather than acknowledge that it may not properly proceed with an arbitration against Ressler and Orchard Capital, or at least may not do so absent the Court's determination of arbitrability, Vishipel has taken the position that it will proceed with the arbitration against Ressler and Orchard Capital.

22.    The Singapore arbitration is proceeding. Vishipel, Binh Minh and UTS have selected an arbitrator in the Singapore arbitration and Respondents' Statements of Defense are currently due by May 26, 2010.

23.    Unless the Court grants the declaratory and injunctive relief described herein, Plaintiffs will remain improper parties in the Singapore arbitration and be forced to either defend their interests in a jurisdiction and tribunal on the other side of the world to which they never consented or risk an adverse award against them. Plaintiffs should not be forced into this untenable position.

-4-

# FIRST CLAIM FOR RELIEF

## (Declaratory Relief)

24. Plaintiffs incorporate by reference the allegations in paragraphs 1 through 23 of this Complaint.

25. Vishipel, Binh Minh and UTS are contractually required under the BCC to arbitrate any disputes before the SIAC pursuant to the rules of the UNCITRAL.

26. Ressler and Orchard Capital are neither signatories nor parties to the BCC and therefore cannot be compelled to arbitrate in Singapore.

27. Vishipel wrongfully filed an arbitration demand with the SIAC and is prosecuting an arbitration that includes claims against Ressler and Orchard Capital. Ressler and Orchard Capital object to being compelled to arbitrate the claims that Vishipel has sought to assert against them in Singapore.

28. The determination of whether Ressler and Orchard Capital may be compelled to arbitrate in the Singapore arbitration commenced by Vishipel, even though they are not parties to and did not sign any arbitration agreement, is for a court, and not the arbitrator in Singapore, to decide.

29. An actual controversy exists between Plaintiffs and Defendant regarding whether Vishipel may compel Plaintiffs to arbitrate before the SIAC.

30. Vishipel has not sought or obtained a court determination that it has a right to compel Ressler and Orchard Capital to defend claims in the SIAC arbitration, even though neither Ressler nor Orchard Capital is a party to the arbitration agreement on which Vishipel is relying in Singapore.

31. Accordingly, Plaintiffs seek an order temporarily and permanently enjoining Vishipel from proceeding against Ressler and Orchard Capital in the Singapore arbitration.

32. Alternatively, Plaintiffs seek a judicial declaration that (i) they are not parties to and did not agree to arbitrate in Singapore the claims that

-5-

Vishipel has asserted against them, (ii) they are neither alter egos of UTS nor guarantors of UTS obligations, and (iii) Vishipel may not proceed with in the Singapore arbitration with the claims it has asserted against Ressler and Orchard Capital.

33. Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A. For declaratory and injunctive relief as requested above; and

B. Such other and further relief as the Court may determine to be just and proper.

Dated: May 20, 2010

Respectfully submitted,

Robert A. Sacks (SBN 150146)
Orly Z. Elson (SBN 240645)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067-1725
(310) 712-6600
(310) 712-8800 facsimile

*Attorneys for Plaintiffs Richard Ressler and Orchard Capital Corporation*

Exhibit A

BUSINESS COOPERATION CONTRACT

FOR DEVELOPMENT AND OPERATION OF THE
INTERNET TELEPHONY PROJECT

BETWEEN

VIETNAM MARITIME COMMUNICATION AND ELECTRONICS
COMPANY

AND

BINH MINH TRADING COMPANY LIMITED

AND

UNIVERSAL TELECOM SERVICES INC.

# TABLE OF CONTENTS

ARTICLE 1   DEFINITIONS AND INTERPRETATION   3

   *1.1*   *Definitions*   *3*

   *1.2*   *Interpretation*   *8*

ARTICLE 2   NATURE OF THE PROJECT   9

   *2.1*   *Internet Telephony Project*   *9*

   *2.2*   *Contributions of each Party*   *9*

ARTICLE 3   LICENSE AND APPROVALS   10

   *3.1*   *Investment License*   *10*

   *3.2*   *Conditions precedent to operation of Contract*   *10*

   *3.3*   *Investment License not obtained*   *10*

ARTICLE 4   CONTRACT PERIOD   10

   *4.1*   *Contract Period*   *10*

   *4.2*   *Contract extension*   *10*

   *4.3*   *Conversion of structure*   *11*

ARTICLE 5   CONTRIBUTIONS OF THE PARTIES   11

   *5.1*   *Contribution of Party A*   *11*

   *5.2*   *Contribution of Party B*   *11*

   *5.3*   *Contribution of Party C*   *11*

   *5.4*   *Contributions of capital*   *12*

   *5.5*   *Conditions precedent to the contribution of Party C and Party B*   *12*

ARTICLE 6   OBLIGATIONS OF PARTY A   12

   *6.1*   *Vietnamese Government Approvals*   *12*

   *6.2*   *Arrangements with VNPT*   *13*

   *6.3*   *Importation of the Project Equipment and Facilities*   *13*

   *6.4*   *Local staff*   *13*

   *6.5*   *Work permits and visas*   *13*

   *6.6*   *Network management and operation*   *13*

   *6.7*   *No Third Party agreements*   *13*

   *6.8*   *Financial Information*   *13*

   *6.9*   *Other obligations*   *14*

ARTICLE 7   OBLIGATIONS OF PARTY B   14

   *7.1*   *Contribution of capital by Party B*   *14*

| | | |
|---|---|---|
| 7.2 | *Assistance in relation to the Project* | 14 |
| 7.3 | *No Third Party agreements* | 14 |
| 7.4 | *Financial information* | 14 |
| 7.5 | *Other obligations* | 14 |

ARTICLE 8     OBLIGATIONS OF PARTY C     15

| | | |
|---|---|---|
| 8.1 | *Obligation of Party C to contribute capital* | 15 |
| 8.2 | *Establishment of the Project Network* | 15 |
| 8.3 | *Project support in Vietnam* | 15 |
| 8.4 | *Project support in United States* | 15 |
| 8.5 | *US Project Operating Account and Vietnam Project Operating Account* | 15 |
| 8.6 | *US Government Approvals* | 16 |
| 8.7 | *Spare parts and accessories* | 16 |
| 8.8 | *Financial information* | 16 |
| 8.9 | *No Third Party agreements* | 16 |
| 8.10 | *Management office* | 16 |
| 8.11 | *Other obligations* | 16 |

ARTICLE 9     TIMING OF CONTRIBUTIONS AND OWNERSHIP OF PROJECT ASSETS     17

| | | |
|---|---|---|
| 9.1 | *Timing of contributions* | 17 |
| 9.2 | *Ownership of contribution by Party A* | 17 |
| 9.3 | *Ownership of contribution by Party B* | 17 |
| 9.4 | *Ownership of contribution by Party C* | 17 |
| 9.5 | *Use of the contributions* | 17 |

ARTICLE 10     JOINT ADVISORY BOARD     17

| | | |
|---|---|---|
| 10.1 | *Purpose and functions* | 17 |
| 10.2 | *Functions of the Joint Advisory Board* | 18 |
| 10.3 | *Composition* | 18 |
| 10.4 | *Appointment and dismissal of members* | 18 |
| 10.5 | *Initial members* | 18 |
| 10.6 | *Chairman* | 18 |
| 10.7 | *Meetings* | 19 |

ARTICLE 11     ACCOUNTING, AUDITING AND FINANCIAL REPORTING     20

ARTICLE 12     PROJECT COSTS, PROJECT REVENUES AND DISTRIBUTABLE REVENUE     21

| | | |
|---|---|---|
| 12.1 | *Project Revenue available for sharing* | 21 |
| 12.2 | *Payment of Project Operating Costs and distribution of Project Revenue* | 21 |

ARTICLE 13     FORCE MAJEURE     22

VNBCC140.DOC

| 13.1 | Definition of expression of "Force Majeure Event" | 22 |
| 13.2 | Sharing of risk | 22 |
| 13.3 | No breach | 22 |
| 13.4 | Effect of Force Majeure Event | 23 |

ARTICLE 14    TERMINATION OF THE CONTRACT AND TRANSFER PRICE    23

| 14.1 | Termination upon expiry of the Contract Period | 23 |
| 14.2 | Early termination | 23 |
| 14.3 | Liquidation of this Contract and appointment of Liquidation Committee | 24 |
| 14.4 | Purchase by Party A of Equipment and Facilities of Party B and/ or the Equipment and Facilities of Party C | 24 |

ARTICLE 15    ASSIGNMENT    25

| 15.1 | Assignment | 25 |
| 15.2 | Assignment condition | 25 |
| 15.3 | Registration of assignment with MPI | 25 |
| 15.4 | Pre-emption | 25 |

ARTICLE 16    CONFIDENTIALITY    26

| 16.1 | Confidentiality | 26 |

ARTICLE 17    NOTICES    26

ARTICLE 18    GOVERNING LAWS    27

ARTICLE 19    ARBITRATION    27

| 19.1 | Dispute resolution | 27 |
| 19.2 | Arbitration Panel | 27 |
| 19.3 | Arbitration costs | 27 |
| 19.4 | Continuation of the Contract | 27 |
| 19.5 | The award is final and binding on the Parties | 27 |
| 19.6 | Application to the courts for the enforcement of rights | 27 |

ARTICLE 20    OTHER PROVISIONS    28

VNBCCHC.DOC

BASED ON THE LAWS, DECREE NO. 24/2000/ND-CP AND RELEVANT REGULATIONS OF THE SOCIALIST REPUBLIC OF VIETNAM ON FOREIGN INVESTMENT IN VIETNAM.

**THIS BUSINESS· COOPERATION CONTRACT** is made on 31 December 2000 by and between the following parties:

1.    **VIETNAMESE PARTY A ("Party A")**

(a)    Name: VIETNAM MARITIME COMMUNICATION AND ELECTRONICS COMPANY

(b)    Authorized Representative: Doctor Nguyen Van Phuong, Director

(c)    Head office:    2 Nguyen Thuong Hien, Minh Khai Ward, Hong Bang District, Hai Phong City, Vietnam
    Tel No:    84 31 842073 Fax No:    84 31 842979
    Email:    vishipel@hn.vnn.vn

(d)    Main business: Provision of telecommunication services, trading and direct import, export of electronic telecommunication equipment.

(e)    Business Registration Licence: No. 105622 dated 12 March 1993 issued by the Department of Planning and Investment of Hai Phong City; the Licence for establishment of Inmarsat earth station (LES Gate) and provision of Inmarsat services No. 724/2000/GP-TCBD dated 16 August 2000 issued by the General Department of Post and Telecommunications.

(f)    Bank account: No. 01.03779.0101.5 (USD) at Vietnam Maritime Commercial Joint Stock Bank, Hai Phong Branch.

2.    **VIETNAMESE PARTY B ("Party B").**

(a)    Name: BINH MINH TRADING COMPANY LIMITED

(b)    Authorized Representative: Mr Nguyen Duc Ninh, Director

(c)    Head office:    1B Binh Minh, Pham Ngu Lao ward, Hai Duong City, Hai Duong Province
    Tel No:    84 320 852615
    Fax No:    84 320 856378

(d)    Main business: Trading of consumer materials, potteries, electronics of high technology, export garments, construction, civil construction and food and foodstuff processing.

(e    Establishment licence: Decision No. 03/GP-UB dated 20 March 1992 of the People's Committee of Hai Hung Province and Business Registration Certificate No. 0402040274 dated 22 April 1997 of the Department of Planning and Investment of Hai Duong Province.

VNBCC15C

Ex. A, Pg. 11

(f)   Bank account: No. 4727.3 at Indovina Bank (IVB), Hanoi, Vietnam.

**3.   THE FOREIGN PARTY ("Party C").**

(a)   Name: UNIVERSAL TELECOM SERVICES INC.

(b)   East Coast Office: 2255 Glades Rd, Suite No. 324A, Boca Raton, Florida 33431
Tel No: (561) 989 3211
Fax No: (954) 252 3780

West Coast Office: 9th Floor, 6922 Hollywood Boulevard, Hollywood, California,
90028
Tel No: (323) 860 9500
Fax No: (323) 764 1670

(c)   Management office in Vietnam: 6th Floor, Suite No. 5, Saigon Centre, 65 Le Loi
Boulevard, Ho Chi Minh City, Vietnam
Tel No: 84-8-822 9888
Fax No: 84-8-822 9229

(d)   Vietnam Representative: Ms Tam Mosher

Nationality: US citizen
Permanent address: 1104 Hoolai St., Apt 4, Honolulu, Hawaii, USA 96814

(e)   Authorized Representative: Mr Richard S. Ressler, Chairman

Nationality: American
Permanent address: 9th Floor, 6922 Hollywood Boulevard, Hollywood, California,
90028

(f)   Main business line: Telecommunications

(g)   Establishment: Incorporated in Florida in United States, Company Registration No.
65-0885812

(h)   Bank account: 0030 6094 2118 at Bank of America.

## WHEREAS:

A.   The Parties have agreed to enter into this Contract, in order to record the terms and
conditions on which they have agreed to invest in the development and operation of
the Internet Telephony Project in Vietnam.

B.   By this Contract, the Parties record the basic principles of their co-operation in
relation to the Internet Telephony Project, whereby Party C will invest, assist and
advise Party A and Party B in the program of development and operation of the
Internet Telephony Project in Vietnam.

C.   The Parties have agreed to enter into this Contract on the basis of mutual confidence,
understanding, equality and benefit.

VNBCC15C

## THE PARTIES AGREE AS FOLLOWS:

## ARTICLE 1  DEFINITIONS AND INTERPRETATION

### 1.1   Definitions

Unless the context otherwise requires, the following expressions shall have the following meanings:

"**Affiliate**" of any person means any other person, enterprise or legal entity which controls, is controlled by, or is under common control with, that first person (where "control" means controlling directly or indirectly 50% of the voting shares or stock of the relevant entity);

"**Appendices**" means the documents attached to this Contract (if any) having the heading "Appendix", the contents of which are agreed by each of the Parties and which are initialed by each of the Parties for the purpose of identification;

"**Arbitration Panel**" is defined in Article 19.2(b);

"**Business Day**" means a day on which banks are open for general banking business in Vietnam and Florida, United States, not being a Saturday, Sunday or a public holiday;

"**Business Plan**" means the business plan prepared for the Project and updated from time to time, containing a marketing and sales plan and revenue and cost projections;

"**Commencement Date**" means the date on which the Project Network has been established and tested and all the Parties agree that it is ready for the commencement of operations;

"**Construction Period**" means the period commencing on the Effective Date and expiring on the Commencement Date, being a period of three (3) months or such other period of time as is agreed in writing between the Parties;

"**Contract**" means this Business Cooperation Contract together with the Appendices and attachments, as amended from time to time;

"**Contract Period**" means a period of time equivalent to the term of the Investment License and, if that period is extended, includes the period of extension;

"**Decree 24**" means Vietnamese Government Decree No. 24/2000/ND-CP dated 31 July 2000;

"**DGPT**" means the Department General of Post and Telecommunications;

"**Distributable Revenue**" means Project Revenue less Project Operating Costs and any tax payable to any US Government Authority on the Project Revenue;

"**Effective Date**" means the day an Investment License acceptable to the Parties is issued by MPI;

"**E1 Circuit**" is a digital transmisssion standard for a telephone trunk line being 2.048 million bytes per second capable of supporting thirty (30) 64 kbps telephone lines;

"**Equipment and Facilities of Party B**" means the Project Equipment and Facilities to be supplied to the Project by Party B having a value of US$250,000;

"**Equipment and Facilities of Party C**" means the Project Equipment and Facilities to be supplied to the Project by Party C;

VNBCC14C.DOC

"**Expiry Date**" means the last day of the estimated period of six (6) years from and including the date of the Investment License;

"**Feasibility Study**" means the feasibility for the Project required to be lodged with the MPI with the application for the Investment License, containing the following:

(a)   the background and history of each of the Parties and, in particular, the background and history of Party C;

(b)   an explanation of the technology to be used by the Project and an explanation of how the Project Network will be established, operated and maintained;

(c)   details of the equipment and facilities required to establish the Project Network in Vietnam;

(d)   details of the expected costs of establishing the Project Network;

(e)   details of the arrangements to be put in place with VNPT with respect to the establishment of Points of Presence in Vietnam and the connection of the Project Equipment and Facilities to the VNPT Network;

(f)   details of the expected US Operating Costs and the Vietnam Operating Costs in each Quarter; and

(g)   the initial business plan for the Project, including a cash flow forecast for Project Revenue;

"**Financial Year**" means the period of twelve (12) months, commencing on 1 January and ending on 31 December of the same year;

"**Force Majeure Event**" is defined in Article 13.1;

"**Foreign Investment Law**" means the LFI, Decree 24 and all other Vietnamese Laws applicable to foreign investment under the LFI;

"**Gateway Switch**" means the telephone toll switch and associated telecommunications equipment located at a Point of Presence used to connect telecommunications traffic transmitted from one telecommunications network to another telecommunications network;

"**Gateway Switch Equipment**" means all telecommunications and other equipment located at a Point of Presence;

"**Hawaii Network Operations Center**" means a Network Operation Center in Hawaii owned and operated by USAT, and at which Center an earth station is to be leased by Party C;

"**Investment License**" means the license to be issued by MPI under the Foreign Investment Law which authorises the Parties to implement and operate the Project in the manner contemplated by this Contract, as that license may be extended, amended, varied, supplemented or replaced from time to time;

"**Joint Advisory Board**" or "**JAB**" means the board consisting of the representatives of the Parties established in accordance with the provisions in Article 10;

"**Law on Enterprises**" means the *Law on Enterprises of Vietnam* dated 12 June 1999;

"**LFI**" means the *Law on Foreign Investment in Vietnam* dated 12 November 1996 as amended by Law No. 18/2000/QH10 dated 9 June 2000 amending, and adding to, the *Law on Foreign Investment in Vietnam* dated 12 November 1996;

3

"**Liquidation Committee**" means a liquidation committee established and operating under the provisons of Articles 39 to 44 (inclusive) of Decree 24;

"**Ministry of Finance**" or "**MOF**" means the Ministry of Finance of the Socialist Republic of Vietnam;

"**MPI**" means the Ministry of Planning and Investment of Vietnam which is presently the Vietnamese Government Authority referred to in the *Foreign Investment Law* as being responsible for administration of foreign investment in Vietnam, including the approval and issue of investment licences;

"**Parties**" means Party A, Party B and Party C;

"**Party**" means Party A or Party B or Party C;

"**Party A Employees**" means the employees of Party A assigned by Party A from time to time to work on the set up, operation and maintenance of the Project Equipment and Facilities in Vietnam;

"**Party A License**" means License No. 724/2000/GP-TCBD dated 16 August 2000 issued by DGPT (to be modified) permitting Party A to establish earth stations to access the INMARSAT system and to connect that system to the VNPT Network and thereby transmit telecommunications traffic to VNPT subscribers in Vietnam;

"**Party C Employees**" means the telecommunication technicians and other employees of Party C assigned by Party C from time to time to work on the set up, operation and maintenance of the Project Equipment and Facilities in Vietnam and United States;

"**Party C Set-Up Costs**" means all accurate costs and expenses of Party C relating to the negotiation for and completion of this Contract, the application for the Investment License and the initial set-up, testing and commissioning of the Project Network for the period up to the date on which the Project Network has been commissioned and is ready for operation and all Vietnamese Government Approvals have been obtained including, without limitation:

(a)     all one-off costs incurred by Party C in linking the Gateway Switch Equipment at each Point of Presence and connecting the system to the VNPT Network;

(b)     consultants' fees and expenses and legal costs and expenses relating to the structuring of the Project, the negotiation for and drafting of this Contract, the application for approval of the Investment License and the obtaining of all Vietnam Government Approvals; and

(c)     the costs and expenses of Party C in providing the Party C Employees to:

    (1)     set-up and test the Project Equipment and Facilities and the Project Network in United States and Vietnam; and

    (2)     train local staff in Vietnam to operate and maintain the Gateway Switch Equipment and all other equipment and facilities at each Point of Presence in Vietnam;

"**Point of Presence**" means any location where a Gateway Switch is located;

"**Project**" or the "**Internet Telephony Project**" means the project that is the subject of the Contract, as the same is more particularly described in Article 2.1;

"**Project Accounts**" means the accounting records recording the capital contributions of the

vNBCC14C.DOC

5

Parties, Project Revenue, US Operating Costs and Vietnam Operating Costs and Distributable Revenue of each Party;

"**Project Capital Account**" means a designated bank account to be held by Party C at a foreign bank branch in Ho Chi Minh City for the receipt of any capital contributed by each Party in cash;

"**Project Equipment and Facilities**" means all of the synchronous equipment, motor vehicles, motorcycles, facilities, materials and other assets, including required accessories and spare parts (described in detail in the Feasibility Study), which are required for the set up, operation and maintenance of the Project Network in Vietnam and United States including, without limitation, all equipment and facilities required to set up the Gateway Switches at the Points of Presence;

"**Project Operating Costs**" means the aggregate of US Operating Costs and the Vietnam Operating Costs;

"**Project Network**" means the telecommunications network established by investment of the Project Equipment and Facilities to enable the termination in Vietnam of telecommunications traffic originating in United States;

"**Project Network Services**" means the telecommunication services provided by the Project Network namely, the collection in United States of telecommunication traffic and its transmission to Vietnam and termination by way of the VNPT Network to VNPT's subscribers in Vietnam;

"**Project Revenue**" means the revenue derived by the Parties from the sale of Project Network Services to telecommunication companies in United States;

"**Quarter**" means each period of three (3) months in a financial year, ending on 31 March, 30 June, 30 September, 31 December each year;

"**Saigon Centre Premises**" is defined in Article 3.1(b);

"**SBV**" means the State Bank of Vietnam;

"**Third Party**" means any legal entity or person other one of the Parties;

"**United States**" means the United States of America;

"**USAT**" means USAsia Telecom LLC, a Delaware corporation with principal place of business located at 970 N. Kalaheo Avenue, Suite C-308 Kailua, Hawaii;

"**USD**" or "**US$**" means the existing lawful currency of the United States of America;

"**US Government Approval**" means any written approval, consent, authorisation, notarisation, concession, acknowledgement, agreement, licence, permit, decision or similar item required to be obtained from a US Government Authority by a Party for the construction, financing, ownership, operation and maintenance of the Project;

"**US Government Authority**" means any Government agency or ministry of the State or Federal Governments of the United States;

"**US Operating Costs**" means all actual costs and expenses payable by Party C in connection with the initial set up, operation and maintenance of the Project in United States (including Hawaii) including, without limitation:

(a)     the rent payable for the leasing of the use of a fibre optic cables (T-1 lines or greater

VNBCC14C.DOC

capacity) linking a Gateway Switch at an operations center in Los Angelos and the Hawaii Network Operations Center;

(b) the fees payable in United States for the use of DS-3 links (45 mbps) to local telecommunication company networks in United States;

(c) the rent payable for leasing and maintenance of an earth station at the Hawaii Network Operations Center or other operation centres;

(d) the rent, utility charges and related costs of leasing office premises (including offices in Florida and Hawaii) and premises for the housing of Project Equipment and Facilities in United States;

(e) the rent and other fees payable for the leasing of "satellite segments" with respect to the transmission of telecommunications traffic from the Hawaii Network Operations Center to Points of Presence in Vietnam;

(f) fees payable in relation to the leasing of Gateway Switching Equipment at Points of Presence in United States;

(g) the cost of renting any T-1 links in United States;

(h) the fees payable for the use of "Internau" six mbps links.

(i) agency commissions payable to agents of Party C selling "traffic minutes" to telecommunication companies in United States;

(j) the salaries, allowances and other costs and expenses of the Party C Employees (at the market rates and to be agreed by all Parties) assigned to operate the Project Equipment and Facilities in United States;

(k) depreciation expenses in respect of all Project assets located in United States; and

(l) all other costs and expenses relating to the set-up, operation and maintenance of the Project Network in United States approved from time to time by the Joint Advisory Board;

"US Project Operating Account" means a designated bank account to be held by Party C at a bank in United States for the receipt of all Project Revenue;

"Vietnam" means the Socialist Republic of Vietnam;

"Vietnamese Government" means the Government of the Socialist Republic of Vietnam;

"Vietnamese Government Approval" means any written approval, consent, authorisation, notarisation, concession, acknowledgement, agreement, licence, permit, decision or similar item required to be obtained from a Vietnamese Government Authority by a Party for the construction, financing, ownership, operation and maintenance of the Project;

"Vietnamese Government Authority" means the Vietnamese Government and all State committees, ministries, general departments, agencies and instrumentalities and also includes provincial, municipal and district people's committees, departments and authorities of Vietnam;

"Vietnamese Law" or "Laws" means all legislation issued by the National Assembly, the Standing Committee of the National Assembly of Vietnam and any Vietnamese Government Authority, in force from time to time including, but not limited to, codes, laws, ordinances, decrees, circulars, resolutions, official letters, decisions and other pronouncements;

5

"Vietnam Operating Costs" means all actual costs and expenses payable by a Party in connection with the set up, operation and maintenance of the Project Network in Vietnam including, without limitation:

(a)   the rent, utility charges and related costs of Party A and/or Party C leasing office premises (including offices in Ho Chi Minh City) and premises for the housing of Project Equipment and Facilities in Vietnam including the Gateway Switching Equipment at the Points of Presence in Vietnam;

(b)   the rent and other fees, costs and expenses payable by Party A and/or Party C to VNPT for the leasing of E1 Cards from VNPT;

(c)   the costs and expenses charged by VNPT to Party A and/or Party C for the connection of the Equipment and Facilities to the VNPT Network and the ongoing fees charged by VNPT with respect to the termination of telecommunications traffic in Vietnam after the traffic enters the VNPT Network;

(d)   the costs of repair, ongoing maintenance and upgrades of all Project Equipment and Facilities located in Vietnam charged by Party C, including the fees, costs and expenses of the Party C Employees;

(e)   all costs and expenses relating to the employment by any Party of local staff (at rates to be agreed by all Parties) in Vietnam (approved by each other Party or the Joint Advisory Board);

(f)   the salaries, allowances and other costs and expenses of the Party A Employees (at market rates and to be agreed by all Parties) assigned to operate the Project Equipment and Facilities in Vietnam;

(g)   the salaries, allowances and other costs and expenses of the Party C Employees (at market rates and to be agreed by all Parties) assigned to operate the Project Equipment and Facilities in Vietnam;

(h)   depreciation expenses in respect of all Project assets located in Vietnam; and

(i)   all other costs and expenses relating to the set-up, operation and maintenance of the Project Network in Vietnam approved from time to time by the Joint Advisory Board;

"Vietnam Project Operating Account" means a designated bank account(s) to be held by Party C at a foreign bank branch in Ho Chi Minh City, Vietnam;

"VND" means the existing lawful currency of the Socialist Republic of Vietnam;

"VNPT" means the Vietnam Post and Telecommunications Corporation; and

"VNPT Network" means the Vietnamese national telecommunication network owned by VNPT.

1.2   Interpretation

In this Contract, unless the context otherwise requires:

(a)   words importing the singular include the plural and vice versa;

(b)   a reference to an individual or person includes a reference to an enterprise or other legal entity;

(c)   where the day on or by which a matter or thing is to be done (including the payment of

money) is not a Business Day, that matter or thing must be done on or by the next Business Day;

(d)     a reference to a party includes that party's successors and permitted assigns; and

(e)     a reference to any Vietnamese Law or other law includes a substitution, consolidation, amendment or replacement of that Vietnamese Law or other law.

## ARTICLE 2   NATURE OF THE PROJECT

### 2.1   Internet Telephony Project

(a)     At present, the telecommunications equipment sending telecommunications traffic through undersea cables from United States to Vietnam is overloaded.  The Project will by-pass this system by using advanced satellite data transmission technology. The telecommunications traffic originating in United States will be sent via undersea fiber optic cable to the Hawaii Network Operations Center.  The telecommunications traffic will then be sent from a Gateway Switch at the Hawaii Network Operations Center via satellite to Gateway Switches in Vietnam (initially located in Ho Chi Minh City and then later in Hanoi and other locations) and then connected via E-1 Circuits to the VNPT Network for transmission to VNPT's subscribers in Vietnam.

(b)     Party C shall lease office space at Saigon Centre in Ho Chi Minh City ("Saigon Centre Premises") to house the Gateway Switch Equipment and the earth station shall be attached to the outside of the Saigon Centre building.

(c)     The telecommunications traffic will only be transmitted one way, from United States to Vietnam.

(d)     As the telecommunications traffic is connected to the VNPT Network, VNPT will be able to fully monitor the system and control and account for all of the telecommunications traffic sent from United States.

(e)     Party C will sell the right to use the Project Network to large telecommunication companies in United States and all Project Revenue will be derived from the sale of such rights to companies in United States rather than Vietnam.  The Project Revenue will be deposited in the US Project Operating Account and, after transfer of moneys to the Parties to pay US Operating Costs, Vietnam Operating Costs and the payment of taxes, the balance will be distributed to the Parties in accordance with the provisions of Article 12.

### 2.2   Contributions of each Party

The Parties shall jointly cooperate in the set up, operation and maintenance of the Project Network in United States and Vietnam and the connection of the Project Equipment and Facilities to the VNPT Network.

## ARTICLE 3  LICENSE AND APPROVALS

### 3.1    Investment License

Promptly after the signing of this Contract, the Parties shall lodge an application for an Investment License with MPI, together with relevant documents as required by MPI and other relevant Vietnamese Government Authorities, and the Law.   The Parties shall jointly cooperate to provide information and follow necessary procedures of MPI and the Law in order to obtain the Investment License.

### 3.2    Conditions precedent to operation of Contract

The Parties shall not be obliged to perform any obligations under this Contract other than those contained in this Article 3 until such time as:

(a)     an Investment License containing terms acceptable to the Parties has been issued;

(b)     the Party A License has been modified in a manner acceptable to the Parties to enable it to perform its obligations under this Contract; and

(c)     Party C has obtained all US Government Approvals (if any) required to set up, operate and maintain the Project Network.

### 3.3    Investment License not obtained

(a)     In the event that:

    (1)     MPI does not issue an Investment License with terms and conditions acceptable to the Parties, including tax and duty treatments no less favorable than those specified in the Feasibility Study; or

    (2)     a revised Party A License in a form and content acceptable to the Parties is not issued,

    the Parties shall endeavor in good faith to look for an appropriate solution.

(b)     If no solution acceptable to the Parties is found within twelve (12) months from the receipt of a response from MPI to the application for an Investment License, each Party shall have the right to declare by written notice to each other Party that this Contract is terminated.  Thereafter, none of the Parties shall have any right whatsoever to require any performance of this Contract by any other Party or to claim any damages from any other Party.

## ARTICLE 4  CONTRACT PERIOD

### 4.1    Contract Period

The period of this Contract shall be the continuous period of time beginning on the date of issue of the Investment License and ending on the Expiry Date (six years).   The Contract Period may be extended by mutual agreement in accordance with Article 4.2.

### 4.2    Contract extension

(a)     If the Parties wish the Contract to be extended then, at least twelve (12) months prior to the expiry of the Contract Period, the Parties shall commence amicable discussions

VNBCC14C.DOC

Ex. A, Pg. 20

i:

on the extension of the term of this Contract and come to a mutual agreement at least six (6) months prior to the Expiry Date.

(b) If, following their discussions, the Parties agree to extend the Contract Period, they shall submit to MPI, at least six (6) months before the Expiry Date, an application for an extension of the term of this Contract.

(c) The extension of the term of this Contract shall be effective upon the Parties receiving from MPI the revised Investment License recording the extension of the term of the Investment License.

### 4.3 Conversion of structure

Promptly after the appropriate changes in the Law are made, and subject to the Laws, the Parties shall make a good faith effort to convert this BCC to either a joint venture enterprise under the LFI or a joint stock company under the *Law on Enterprises*.

## ARTICLE 5  CONTRIBUTIONS OF THE PARTIES

### 5.1 Contribution of Party A

(a) Party A hereby agrees to:

  (1) apply for the issue of a revised Party A License enabling the Project Network to be established in Vietnam and to operate in the manner described in Article 2.1 and the Feasibility Study; and

  (2) obtaining all other Vietnamese Government Approvals required for the Project.

(b) Party A shall provide Party A Employees sufficient local staff to administer and operate the Gateway Switch Equipment at each Point of Presence.

(c) On behalf of the Parties, Party A shall negotiate with VNPT to connect the Project Network to the VNPT Network.

### 5.2 Contribution of Party B

Party B shall contribute the Equipment and Facilities of Party B, having a value of US$250,000.

### 5.3 Contribution of Party C

Subject to Article 5.5, Party C shall:

(a) supply the Equipment and Facilities of Party C to the Project and pay the Party C Set-Up Costs, being an aggregate contribution of an amount of US$2,250,000;

(b) assign Party C Employees to the Project to:

  (1) provide technical assistance and know how with respect to the initial set-up, testing and operation of the Project Equipment and Facilities;

  (2) operate and maintain the Project Equipment and Facilities in United States and Vietnam; and

  (3) train local staff to operate and maintain the Gateway Switch Equipment and all other equipment and facilities at each Point of Presence in Vietnam;

VNBCC14C.DOC

Ex. A, Pg. 21

(c)    negotiate all fee arrangements with telecommunication service providers in United States;

(d)    market and negotiate for the sale of the Project Network Services to telecommunication companies in United States, and negotiate all fee arrangements in relation to the sale of the Project Network Services in United States; and

(e)    arrange for the establishment and operation of the Project Capital Account, the US Project Operating Account and the Vietnam Project Operating Account.

### 5.4   Contributions of capital

(a)    Party C shall contribute:

    (1)    the Equipment and Facilities of Party C; and

    (2)    cash to meet the Party C Set-Up Costs,

    in an aggregate amount of US$2,250,000.

(b)    Party B shall contribute the Equipment and Facilities of Party B to the Project, in an aggregate amount of US$250,000.

(c)    Party B and Party C shall keep accurate records of its respective contributions to the Project.

### 5.5   Conditions precedent to the contribution of Party C and Party B

The contribution by Party C and Party B (described in Articles 5.3 and 5.2) shall be conditional upon:

(a)    the issue of the Investment License;

(b)    the issue of a revised Party A License,

as specified in Article 3.2.


## ARTICLE 6   OBLIGATIONS OF PARTY A

### 6.1   Vietnamese Government Approvals

Party A shall take all necessary steps and shall be responsible for obtaining all Vietnamese Government Approvals required for the establishment and operation of the Project in Vietnam, including without limitation:

(a)    the issue of a revised Party A License enabling the Project Network to be established in Vietnam and to operate in the manner described in Article 2.1 and the Feasibility Study;

(b)    together with Party C obtain the approval from the SBV for the establishment and operation of the US Project Operating Account; and

(c)    all import licenses and other Vietnamese Government Approvals required to enable the Project Equipment and Facilities to be imported into Vietnam (and the applications for such Vietnamese Government Approvals will state that Party A is importing the Project Equipment and Facilities for the purposes of this Contract) as well as an exemption from import duty in respect of such equipment and facilities.

VNBCC14C.DOC

13

### 6.2   Arrangements with VNPT

Party A shall:

(a)   negotiate with VNPT (with input from Party B) for the connection to the VNPT Network of the Project Equipment and Facilities at the Points of Presence to enable the receipt of telecommunications traffic received from the Hawaii Network Operations Center, and the fees payable VNPT with respect to the same; and

(b)   negotiate with VNPT (with input from Party B) the on-going wholesale fee arrangements with for the transmission of telecommunications traffic through the VNPT Network on the basis that the maximum fees are no higher than the charges paid by local VNPT subscribers in Vietnam.

### 6.3   Importation of the Project Equipment and Facilities

Party A shall be responsible for importation of the Project synchronous equipment including of importation procedures, customs clearance, transportation procedures, warehousing and storage, etc. The Project Equipment and Facilities imported into Vietnam shall become the Project fixed assets.

### 6.4   Local staff

Party A shall provide sufficient Party A Employees to operate and maintain the Gateway Switch Equipment at each Point of Presence.

### 6.5   Work permits and visas

Party A shall render all necessary assistance to Party C in obtaining work permits and entry/exit visas and other related documents required by Party C Employees to work in Vietnam.

### 6.6   Network management and operation

Party A shall assist Party C in the planning, management and operations of the Project Network in an efficient and commercial way so as to maximize the economic and cost efficiency of the Project.

### 6.7   No Third Party agreements

Party A undertakes not to develop or enter into any agreement with any Third Party to develop, during the Contract Period, any satellite based telecommunications project competing with this Project in Vietnam.

### 6.8   Financial information

Party A shall:

(a)   maintain accurate and up-to-date records in relation to its Vietnam Operating Costs throughout the Contract Period;

(b)   deliver to Party B and Party C a copy of the records of its Vietnam Operating Costs promptly after the end of each Quarter; and

(c)   promptly provide on request from Party B and/or Party C access to Party A's financial records relating to the Project.

### 6.9   Other obligations

Party A shall:

(a)    fulfill all of its taxation obligations to the Vietnamese Government Authorities with respect to the receipt of Distributable Revenue under the terms of this Contract; and

(b)    provide all necessary information to the Joint Advisory Board to enable the Joint Advisory Board to perform its functions.

## ARTICLE 7   OBLIGATIONS OF PARTY B

### 7.1    Contribution of capital by Party B

Subject to Article 5.5, Party B shall contribute the Equipment and Facilities of Party B, having a value of US$250,000 during the Construction Period.

### 7.2    Assistance in relation to the Project

Party B assists Party A and Party C in the process of setting-up and operating the Project.

### 7.3    No Third Party agreements

Party B undertakes not to develop or enter into any agreement with any Third Party to develop, during the Contract Period, any satellite based telecommunications project competing with this Project in Vietnam.

### 7.4    Financial information

Party B shall:

(a)    maintain accurate and up-to-date records in relation to its Vietnam Operating Costs throughout the Contract Period;

(b)    deliver to Party A and Party C a copy of the records of its Vietnam Operating Costs promptly after the end of each Quarter; and

(c)    promptly provide on request from Party A and/or Party C access to Party B's financial records relating to the Project.

### 7.5    Other obligations

Party B shall:

(a)    comprehensively insure the Equipment and Facilities of Party B and obtain appropriate public liability insurance with respect to the operation of the Equipment and Facilities of Party B;

(b)    fulfill all of its taxation obligations to the Vietnamese Government Authorities with respect to the receipt of Distributable Revenue under the terms of this Contract; and

(c)    provide all necessary information to the Joint Advisory Board to enable the Joint Advisory Board to perform its functions.

VNBCC14C.DOC

:5

## ARTICLE 8   OBLIGATIONS OF PARTY C

### 8.1   Obligation of Party C to contribute capital

Subject to Article 5.5, Party C shall supply the Equipment and Facilities of Party C and fund the Party C Set-Up Costs, being an aggregate contribution of an amount of US$2,250,000.

### 8.2   Establishment of the Project Network

(a)   Subject to Article 5.5, Party C shall provide the Equipment and Facilities of Party C during the Construction Period and in accordance with the Feasibility Study.

(b)   Party C shall set up, test and commission the Project Equipment and Facilities at each Point of Presence in Vietnam.

(c)   Party C shall connect the transmission equipment of the Project located in United States to the Hawaii Network Operations Center and the Gateway Switch Equipment at the Hawaii Network Operations Center to the Gateway Switch Equipment at each Point of Presence in Vietnam.

### 8.3   Project support in Vietnam

Party C shall:

(a)   assign Party C Employees to the Project to:

    (1)   provide technical assistance and know how with respect to the initial set-up, testing and operation of the Project Equipment and Facilities;

    (2)   operate and maintain the Project Equipment and Facilities in United States and Vietnam; and

    (3)   train local staff to operate and maintain the Gateway Switch Equipment and all other equipment and facilities at each Point of Presence in Vietnam;

(b)   arrange for the set up of the Gateway Switch Equipment at the Saigon Centre Premises and other Points of Presence in Vietnam;

(c)   assign Party C Employees to provide on-going advice with respect to the operation and maintenance of the Project Equipment and Facilities; and

(d)   transfer any technology of Party C to the Project.

### 8.4   Project support in United States

Party C shall:

(a)   negotiate all fee arrangements with telecommunication service providers in United States; and

(b)   market and negotiate for the sale of the Project Network Services to telecommunication companies in United States, and negotiate all fee arrangements in relation to the sale of the Project Network Services in United States.

### 8.5   US Project Operating Account and Vietnam Project Operating Account

(a)   Party C shall arrange for the establishment and operation of the US Project Operating Account.

(b)   Party C shall also establish and operate the Vietnam Project Operating Account,

VNBCCHC.DOC

which shall be used for the purpose of paying Vietnam Operating Costs incurred by each Party.

### 8.6    US Government Approvals

Party C shall obtain all US Government Approvals required to set up, operate and maintain the Project Network.

### 8.7    Spare parts and accessories

(a)    The Parties agree, in accordance with the Business Plan, that the Equipment and Facilities of Party B and the Equipment and Facilities of Party C shall include accessories and spare parts sufficient for the Contract Period and that the costs of such accessories and spare parts shall form part of the capital contributed by each of Party B and Party C.

(b)    Upon the expiry of the warranty period for the Equipment and Facilities of Party B and the Equipment and Facilities of Party C, Party C shall be responsible for the upkeep and maintenance of the Equipment and Facilities of Party B and the Equipment and Facilities of Party C. The costs of such maintenance and upkeep shall be included in the Vietnam Operating Costs.

### 8.8    Financial information

Party C shall:

(a)    maintain accurate and up-to-date records in relation to the Project Revenue, Vietnam Operating Costs and US Operating Costs throughout the Contract Period;

(b)    prepare (or require an international accounting firm with an office in Vietnam to prepare) the financial statements required by Vietnamese Law including, without limitation, Article 64 of Decree 24;

(c)    deliver to Party A and Party B a copy of the records of it's the Project Revenue, Vietnam Operating Costs and US Operating Costs promptly after the end of each Quarter; and

(d)    promptly provide on request from Party A and/or Party B access to Party C's financial records relating to the Project.

### 8.9    No Third Party agreements

Party C undertakes not to develop or enter into any agreement with any Third Party to develop, during the Contract Period, any satellite based telecommunications project competing with this Project in Vietnam.

### 8.10   Management office

In accordance with the Law, Party C shall apply in the application for the Investment License for permission to establish and maintain a management office in Vietnam to oversee its interest in this Contract. The management office shall be established at the Saigon Centre Premises.

### 8.11   Other obligations

Party C shall:

VNBCC14C.DOC

17

(a)    comprehensively insure the Equipment and Facilities of Party C and obtain appropriate public liability insurance with respect to the operation of the Equipment and Facilities of Party C;

(b)    fulfill all of its taxation obligations to Vietnamese Government Authorities and US Government Authorities with respect to the receipt of Distributable Revenue under the terms of this Contract; and

(c)    provide all necessary information to the Joint Advisory Board to enable the Joint Advisory Board to perform its functions.

(d)    promptly remit the Vietnam Operating Costs and Distributable Revenue to Party A and Party B at the end of each Quarter in accordance with the provisions of Article 12.

## ARTICLE 9   TIMING OF CONTRIBUTIONS AND OWNERSHIP OF PROJECT ASSETS

### 9.1    Timing of contributions

Subject to this Contract, the Parties hereby agree to make their contributions promptly after the issue of the Investment License and the satisfaction of the other conditions precedent specified in Article 3.2.

### 9.2    Ownership of contribution by Party A

Party A shall retain title to, and management of, all assets forming part of Party A's contribution throughout the Contract Period.

### 9.3    Ownership of contribution by Party B

Party B shall retain title to all Equipment and Facilities of Party B until the Expiry Date. Upon the Expiry Date, Party B shall transfer the Equipment and Facilities of Party B to Party A.

### 9.4    Ownership of contribution by Party C

Party C shall retain title to all Equipment and Facilities of Party C until the Expiry Date at which time Party C will transfer free of charge ownership of the Equipment and Facilities of Party C to Party A.

### 9.5    Use of the contributions

The Parties agree that the Project Equipment and Facilities by the Parties shall be used only for the purposes of the Project and must not be used for any other purposes.

## ARTICLE 10 JOINT ADVISORY BOARD

### 10.1  Purpose and functions

The Parties agree to establish a Joint Advisory Board having the functions of advising and making recommendations to the Parties as to the implementation of the Project. The Joint Advisory Board shall not have a legally binding role in controlling, implementing and managing the activities, operations and business of the Project in Vietnam.

VNBCC181.DOC

### 10.2  Functions of the Joint Advisory Board

The functions of the Joint Advisory Board are as follows

(a)  to advise on sales, business and marketing;

(b)  to review and make recommendations in relation to the technical and technological issues relating to the Project;

(c)  to make recommendations to the Parties in relation to the management and implementation of the Project;

(d)  to make recommendations in relation to amendments of the Business Plan and draft amendments to the Business Plan;

(e)  to review the schedule of implementation of the Project as set out in the Business Plan;

(f)  to review, on an annual basis, the Business Plan and make recommendations on the annual budget of Project Revenue and expenditure and budget issues of the Project in general;

(g)  to review and make recommendations to the Parties on the annual training plan; and

(h)  to make recommendations to resolve any disputes between the Parties arising out of or relating to this Contract in the spirit of reconciliation.

### 10.3  Composition

The Joint Advisory Board shall consist of five (5) members of whom:

(a)  one (1) person shall be appointed by Party A;

(b)  one (1) person shall be appointed by Party B; and

(c)  three (3) persons shall be appointed by Party C.

### 10.4  Appointment and dismissal of members

(a)  Each Party may appoint any person to be a member of the Joint Advisory Board and any such member may be replaced by a written notice signed by the appointing Party to each of the other Parties. The appointment and replacement shall take effect on the date a written notice is received by each of the other Parties or the date of appointment or dismissal stipulated in the notice (if stipulated).

(b)  Any person appointed to be a member shall be entitled to resign by way of submitting a written notice to each of the other Parties. Each member of the Joint Advisory Board shall continue to be a member of the Joint Advisory Board until such time as that member resigns from the position, or is replaced by the appointing Party.

### 10.5  Initial members

The Parties must appoint their member(s) to the Joint Advisory Board within fifteen (15) days from the Effective Date.

### 10.6  Chairman

A member of Party C shall be appointed to be the Chairman of the Joint Advisory Board. The term of the Chairman of the Joint Advisory Board shall be the Contract Period, provided that if Party A and/or Party B are of the view that the Chairman selected by Party C is not

12

complying with his obligations under this Contract, either of Party A or Party B may request Party C to replace the Chairman with another person selected by Party C.

## 10.7   Meetings

The meetings of the Joint Advisory Board shall be convened in the following manner:

(a)   **First meeting:** The first meeting of the Joint Advisory Board shall be organized within one month of the Effective Date and thereafter the Joint Advisory Board shall meet at least once every Financial Year.

(b)   **Place of the meetings:** Each meeting of the Joint Advisory Board must be organized at the place determined by the Chairman of the Joint Advisory Board.

(c)   **Right to convene the meetings:** The Chairman of the Joint Advisory Board shall be the person entitled to convene the meetings of the Joint Advisory Board. In addition, if necessary, any two or more members of the Joint Advisory Board shall be entitled to request the Chairman of the Joint Advisory Board to convene a meeting of the Joint Advisory Board at any time by sending a written notice to the Chairman of the Joint Advisory Board requesting the convening of the meeting.

(d)   Notice: At least thirty (30) days before the proposed date of the meeting of the Joint Advisory Board, the Chairman shall send to each member a written notice by mail or facsimile advising of the meeting. The notice must state clearly the agenda items and issues that the Chairman or two or more members requesting the meeting wish to raise at the meeting. No issue shall be resolved at the meeting of the Joint Advisory Board if the issue is not incorporated in the agenda attached to the meeting notice, unless all the members attending the meeting unanimously agree to resolve the issue at the meeting.

(e)   **Substitutes:** Each member of the Joint Advisory Board shall be entitled, by a written notice to the Chairman, to appoint his/her representative or proxy for a particular period of time to attend the meetings of the Joint Advisory Board in the absence of such member.

(f)   **Minimum number of representatives:** The minimum number of persons required for a quorate meeting shall be three (3) persons.

(g)   **Resolutions of the Joint Advisory Board:** The resolutions of the Joint Advisory Board shall be passed by unanimous vote of the members attending in person or by proxy. Each resolution shall be understood as a recommendation only and shall not be binding on any Party. The Parties shall endeavor to implement the Project in accordance with the recommendations of the Joint Advisory Board.

(h)   Minutes: The minutes of the meetings of the Joint Advisory Board must be prepared in English by a secretary appointed by a majority of the Joint Advisory Board. A copy of the draft minutes must be forwarded to each member of the Joint Advisory Board within fifteen (15) days of the relevant meeting for approval by each member. Joint Advisory Board members must notify the Chairman and the secretary of any objection to the minutes within fifteen (15) days of receipt or they will be deemed to have approved the draft minutes.

29

## ARTICLE 11   ACCOUNTING, AUDITING AND FINANCIAL REPORTING

The Parties hereby agree that all matters in relation to the finances of the Project shall be carried out in accordance with Vietnamese Law and the following provisions:

(a)   **Accounting system:** Party C shall formulate a separate system of accounting for the Project, and for the Project Accounts.  The records of Party A and Party B shall continue to be formulated on the basis of and in accordance with the existing accounting systems of Party A and Party B which have been approved by the Ministry of Finance.

(b)   **Currency of accounts and approval of accounting system:** The Parties shall apply to the Ministry of Finance for the Project Accounts and other financial records relating to the Project to be denominated in USD using Generally Accepted Accounting Principles accepted in the United States.

(c)   **Financial records:** Each Party shall maintain its financial records in an accurate and complete manner and shall deliver a copy of its financial records and other relevant documents relating to the Project to each other Party following the end of each Quarter and at the end of each Financial Year.  Party C shall prepare and lodge the audited financial statements of the Project (and other financial accounts) with relevant Vietnamese Government Authorities as required by Vietnamese Law.

(d)   **Expenditures of each Party:** Each Party must keep accurate and up-to-date records of:

    (1)   its capital expenditures with respect to the Project and its Distributable Revenue;

    (2)   in the case of Party C, all Project Revenue into the US Project Operating Account, and all Vietnam Operating Costs and US Operating Costs; and

    (3)   in the case of Party A and Party B, all Vietnam Operating Costs.

(e)   **Exchange rate to be applied in respect of expenditures:** The Parties agree that the USD/VND exchange rate to be applied with respect to the reimbursement of expenditures of each Party shall be the official rate published by SBV at the time the expenditure is incurred.

(f)   **Language of accounts:** Pursuant to Vietnamese Law, Party A and Party B must maintain their accounting records in Vietnamese but shall have them translated into English.  Party C shall cause its accounts in relation to the Project to be maintained in English and translated into Vietnamese.

(g)   **Auditing:** Following the end of each Financial Year:

    (1)   Party C shall arrange for the Project Accounts to be audited in the United States by a licensed auditor employed by an international firm of accountants having offices in Florida, United States and Vietnam; and

    (2)   if required by Vietnamese Law, Party C shall arrange for the Project Accounts to be audited in Vietnam by a firm of international accountants with offices in Hanoi and Ho Chi Minh City.

If any Party wishes to conduct any additional audit of the Project Accounts, it may do so at its own cost after giving reasonable notice to each of the other Parties.

\NBCC14C.DOC

## ARTICLE 12 PROJECT COSTS, PROJECT REVENUES AND DISTRIBUTABLE REVENUE

### 12.1   Project Revenue available for sharing

After collection of Project Revenue and the reimbursement to each Party of its US Operating Costs and Vietnam Operating Costs (as applicable), and the payment of any tax payable to any US Government Authority on the Project Revenue, all Parties agree to distribute Distributable Revenue as follows:

(a)   Party A:       35%;

(b)   Party B:       15%; and

(c)   Party C:       50%.

### 12.2   Payment of Project Operating Costs and distribution of Project Revenue

(a)   Party C shall ensure that all Project Revenue is credited to the Project Operating Account.

(b)   Within ten (10) Business Days after the end of each Quarter:

   (1)   Party A shall advise the other Parties of its Vietnam Operating Costs incurred during the preceding Quarter;

   (2)   Party B shall advise the other Parties of its Vietnam Operating Costs incurred during the preceding Quarter;

   (3)   Party C shall advise the other Parties of its US Operating Costs and its Vietnam Operating Costs incurred during the preceding Quarter; and

   (4)   Party C shall advise the other Parties of the total Project Revenue received during the preceding Quarter.

(c)   Following receipt of the information referred to Articles 12.2(b)(1) and 12.2(b)(2), Party C shall prepare financial statements which set out details of: (1) the Project Revenue earned during the preceding Quarter, (2) US Project Operating Costs incurred during the preceding Quarter, (3) Vietnam Operating Costs incurred during the preceding Quarter and (4) taxes payable to any US Government Authority in respect of the Project Revenue from preceding Quarters.

(d)   Party C shall then:

   (1)   deliver to Party A and Party B a copy of the financial statements referred to in Article 12.2(c);

   (2)   deduct and pay from the Project Revenue any tax payable to any US Government Authority on the Project Revenue;

   (3)   reimburse each Party for the amount of Project Operating Costs paid by it during the preceding Quarter(s) (or a pro-rata portion thereof according to a priority basis if Project Revenue is insufficient to cover Project Operating Costs and tax); and

   (4)   transfer to each Party its share of Distributable Revenue according to Article 12.1,

VNBCC14C.DOC

within thirty (30) Business Days after the end of the preceding Quarter, provided that Party C shall not distribute Distributable Revenue until each Party's Project Operating Costs for all preceding Quarters has been paid in full.

(e)     Without prejudice to the receiving Party's other rights, if distribution of Party A's or Party B's share of Distributable Revenue does not occur within the time specified in Article 12.2(d), interest shall accrue on a daily basis from and including the due date up to the date of payment at the rate offered by the SBV on short term deposits of USD.

(f)     If any Party refutes any costs claims made by any other Party, the Party challenging the claim shall notify each other Party in writing. Party C must deduct the costs claimed and shall refer the matter to the Joint Advisory Board for resolution. Following resolution by the Joint Advisory Board, Party C shall account for any change resulting from the decision of the Joint Advisory Board in the first Quarter following resolution of the claim by the Joint Advisory Board.

(g)     Each Party shall be severally liable to pay tax on its share of Distributable Revenue in accordance with the requirements of US Government Authorities and Vietnam Government Authorities.

## ARTICLE 13 FORCE MAJEURE

### 13.1   Definition of expression of "Force Majeure Event"

For the purposes of this Contract, the expression "Force Majeure Event" means any unforeseen event in respect of which the occurrence and consequences are not preventable or avoidable including, but not limited to, any changes in policy by a US Government Authority or a Vietnamese Government Authority, earthquakes, storms, flood, fire and other natural disasters, wars, riots, military activities, civil commotion, strikes and labor disputes.

### 13.2   Sharing of risk

Each Party shall take the risk of any loss or damage that it may suffer as the result of the occurrence of any Force Majeure Event.

### 13.3   No breach

Where the obligations of a Party to this Contract, except the obligation to distribute Distributable Revenue, are not fulfilled completely or partially due to the direct consequences of a Force Majeure event which has befallen a Party (the "Affected Party"), the Affected Party shall not be deemed to breach this Contract if it satisfies the following conditions:

(a)     the Force Majeure Event is the direct cause of the failure of the Affected Party to fulfill its obligations under this Contract;

(b)     the Affected Party has used its best endeavors to fulfil its obligations under this Contract and to minimize or avoid losses for each of the other Parties or the Project due to such Force Majeure Event; and

(c)     within fifteen (15) days of the occurrence of the Force Majeure Event, the Affected Party notified the other Parties in writing of the occurrence of the Force Majeure Event, including a statement of the reasons for the delay of the whole or partial fulfillment of this Contract.

### 13.4   Effect of Force Majeure Event

In the event that the Force Majeure Event continues for thirty (30) successive days or 120 days in any period of 360 days, the Parties may:

(a)   revise this Contract considering the impact of the Force Majeure on the performance of this Contract;

(b)   exempt the Affected Party from performing the whole or part of its obligations under this Contract; or

(c)   terminate this Contract in accordance with the provisions of Article 14.

## ARTICLE 14 TERMINATION OF THE CONTRACT AND TRANSFER PRICE

### 14.1   Termination upon expiry of the Contract Period

(a)   On the Expiry Date, subject to the provisions of Article 4, the Contract shall terminate, provided the obligations of Party C to pay to Party A or Party B any outstanding amounts relating to their share of Distributable Revenue under Article 12 shall survive the termination of the Contract

(b)   After the Expiry Date, any Party may apply to MPI for the issue of a decision recording the termination of the business cooperation the subject of this Contract. Promptly after issue of the MPI decision but within the time period required by Law, the Parties shall appoint a Liquidation Committee in the manner required by the Law to terminate the business cooperation the subject of this Contract.

### 14.2   Early termination

The Contract shall terminate earlier than the Expiry Date, in accordance with Article 14.3, if one or more of the following events occur:

(a)   an Arbitration Panel determines pursuant to Article 19 that one of the Parties has committed a serious breach of a fundamental provision of this Contract and a non-defaulting Party serves a notice in writing on the defaulting Party stating its intention to terminate this Contract after a cure period of ninety (90) days if the breach is not cured within the ninety (90) day cure period;

(b)   Party A, Party B or Party C becomes insolvent or becomes the subject of a liquidation or bankruptcy petition that is not dismissed by a competent court within 120 days;

(c)   a Force Majeure Event occurs, in accordance with the provisions of Article 13 and the Parties resolve to terminate this Contract pursuant to Article 13.4;

(d)   the Investment Licence is withdrawn, revoked or cancelled for any reason;

(e)   the Project sustains losses and, after consultation, the Parties deem it impossible to improve the economic situation of the Parties to an extent satisfactory to all of the Parties;

(f)   the imposition of any Law which has the effect of making it impossible or impractical for the Parties to continue the cooperation the subject of this Contract; or

(g)   the parties agree in writing to terminate this Contract prior to the Expiry Date.

### 14.3   Liquidation of this Contract and appointment of Liquidation Committee

If any of the events described in Article 14.2 occurs, any Party may request MPI to issue a decision recording the termination of the business cooperation the subject of this Contract in accordance with the Law. Promptly after issue of the MPI decision but within the time period required by Law, the Parties shall appoint a Liquidation Committee in the manner required by the Law to terminate the business cooperation the subject of this Contract. The Parties agree that the Liquidation Committee must comply with the requirements of Articles 39 to 44 (inclusive) of Decree 24.

### 14.4   Purchase by Party A of Equipment and Facilities of Party B and/ or the Equipment and Facilities of Party C

The Parties agree as follows:

(a)   If this Contract is terminated pursuant to the provisions of:

   (1)   Article 14.2(a), provided the serious breach referred to therein is by Party A;

   (2)   Article 14.2(b) (but only in the case of Party A); or

   (3)   Article 14.2(d), provided the Investment License is withdrawn, revoked or cancelled due to the fault of Party A.

   Party A shall purchase the Equipment and Facilities of Party B in Vietnam and/ or the Equipment and Facilities of Party C in Vietnam. The purchase price shall be determined by agreement of Party A, Party B and Party C. If Party A, Party B and Party C are unable to agree on the purchase price within thirty (30) days of Party B and Party C's request, the purchase price shall be determined by a committee of three qualified appraisers (being qualified accountants or auditors).

(b)   The appraisers shall be instructed to determine the market price of the equipment in the international market, including Vietnam. Each of Party A, Party B and Party C shall nominate one appraiser. The determination of the committee shall be final. Subject to compliance with Vietnamese Law, Party A shall pay the purchase price to a bank account nominated by Party B or Party C (as applicable) in immediately available funds within ninety (90) days of the determination of the purchase price.

(c)   If a decision to terminate is made pursuant to Article 19 and the Arbitration Panel nominates the purchase price, the purchase price shall be paid to Party C and Party B by Party A within ninety (90) days of the date of the award or decision of the Arbitration Panel.

(d)   Ownership of the Equipment and Facilities of Party C shall pass to Party A only upon payment of the purchase price. If the purchase price is not paid when due to Party C pursuant to Article 14.4(b) or Article 14.4(c), Party C shall be entitled to be paid interest at rate payable by the SBV on short term deposits in USD for the period from the date of determination of the purchase price by the committee or Arbitration Panel (as applicable) until the date of payment of the purchase price by Party A.

(e)   Ownership of the Equipment and Facilities of Party B shall pass to Party A only upon payment of the purchase price. If the purchase price is not paid when due to Party B pursuant to Article 14.4(b) or Article 14.4(c), Party B shall be entitled to be paid interest at rate payable by the SBV on short term deposits in USD for the period from the date of determination of the purchase price by the committee or Arbitration Panel

NSCCI4C.DOC

(as applicable) until the date of payment of the purchase price by Party A.

## ARTICLE 15 ASSIGNMENT

### 15.1 Assignment

No Party may assign its rights and obligations under the Contract, unless:

(a)     the assignment is to an Affiliate of the Party; or

(b)   .   unless otherwise agreed by the Parties, it has fulfilled the following conditions and the condition specified in Article 15.2:

(1)     the assignor must assign the whole of (not part of) its rights and obligations under this Contract;

(2)     each other Party to this Contract chooses to waive its rights under Article 15.4 and approves such assignment in writing; and

(3)     the Contract has been performed for at least twelve (12) months from the Commencement Date of the Contract.

### 15.2 Assignment condition

The Parties agree that a Party may assign its rights and obligations under Article 15.1(b) if the assignment does not result in a change in the percentage interests held by the other Parties and the non-assigning Parties are satisfied that the assignment will not adversely impact on the operations and activities of the business cooperation the subject of this Contract.

### 15.3 Registration of assignment with MPI

Any assignment effected under Article 15.1 shall only come into effect on the registration of the assignment with MPI.

### 15.4 Pre-emption

(a)     Except in the case of an assignment under Article 15.1(a), if a Party wishes to assign its rights and obligations under this Contract, the assignor must first offer to each other Party the right to purchase the rights and obligations to be assigned in accordance with the offered terms and conditions.

(b)     Within thirty (30) days of receipt of such offer, each other Party shall be entitled to purchase its share of the whole of (but not part of) such rights and obligations at the price offered.

(c)     If the other Parties do not exercise the right of pre-emption or the Parties fail to agree on the price for the assignment, then the assignor shall be entitled to assign the whole (but not part of) such rights and obligations to a Third Party on terms no more favorable than those initially offered to each other Party.

VNBCC14C.DOC

## ARTICLE 16 CONFIDENTIALITY

### 16.1 Confidentiality

Each Party undertakes, and such undertakings shall bind each of its employees, directors and holders of capital (unless the capital of such Party is publicly listed and traded on a stock market), to keep confidential and not to disclose the contents of the negotiations between the Parties and this Contract, the Feasibility Study, the Business Plan and all the documents relating to the foregoing issues, and any relevant information (confidential information) to any third parties without the written consent of each of the other Parties in advance, unless and to the extent that:

(a)  such disclosure is required by any Vietnamese Government Authority or US Government Authority for the purposes of observing official directives or guidelines;

(b)  the disclosure shall be made to the professional advisers, consultants, or employees of the disclosing Party if required to operate the Contract, provided that the persons to whom the disclosure is made have undertaken to maintain the confidentiality of the information provided as stipulated in this Article 16.1;

(c)  the disclosure is to be made in accordance with or relating to a notice or other documents relating to an offer of shares in relation to capital or other stocks of a Party or its Affiliate, provided that such notice or other documents must comply with the laws applicable to such Party; or

(d)  such confidential information is proved as being in the public domain by the disclosing Party or person, and thus the obligations of confidentiality as set out in this Article 16.1 have ceased to apply to such confidential information.

## ARTICLE 17 NOTICES

17.1  Any notice or other communication required or permitted to be given by or pursuant to this Contract shall be sufficiently given if given in writing and delivered personally or sent by prepaid registered post or facsimile to the addresses of each Party specified on page 1 of this Contract or to such other address or such other person as the Party concerned, may from time to time notify in writing.

17.2  Any such notice or other communication issued in accordance with Article 17.1 shall be deemed to have been received:

(a)  if delivered personally, on the date of delivery;

(b)  if sent by pre-paid post, five (5) days after the date of posting unless actually received earlier; or

(c)  if sent by facsimile, upon confirmation of receipt given to the sender by the addressee.

17.3  All written communication between the Parties shall be in English (and Vietnamese, if necessary) unless otherwise agreed by the Parties.

37

## ARTICLE 18 GOVERNING LAWS

18.1   In the course of implementation of this Contract, the Parties undertake to observe strictly observe Vietnamese Law and the laws of United States.

18.2   This Contract shall be governed and interpreted in accordance with Vietnamese Law except that, to the extent that Vietnam has no relevant law or such law is ambiguous or unclear, then the laws of Singapore shall apply to any dispute or discrepancy arising out of or relating to the form, validity and contents of this Contract.

## ARTICLE 19 ARBITRATION

### 19.1   Dispute resolution

In respect of any dispute, difference of opinion, discrepancy or claim (a "Dispute") arising out of or relating to this Contract, the Parties shall endeavor to resolve such Dispute in a spirit of co-operation and mutual benefit.

### 19.2   Arbitration Panel

(a)   If the conciliation or negotiation to resolve a Dispute fails to be resolved within ninety (90) days of a notice from a Party to any other Party that a Dispute exists discussions, then any party may submit the matter for arbitration in accordance with the rules of UNCITRAL contained in Resolution 31/98 adopted by the United Nations General Assembly on 15 December 1976, which shall be administered by the Singapore International Arbitration Centre ("SIAC").

(b)   Unless the Parties agree to appoint a single arbitrator, the resolution of a Dispute shall be performed by an arbitration panel consisting of three (3) members, with one appointed by each of Party A, Party B and Party C ("Arbitration Panel"). The venue of arbitration shall be the SIAC, Singapore and all arbitration proceedings shall be conducted in English.

### 19.3   Arbitration costs

The award of the Arbitration Panel shall include provisions on arbitration costs. Each Party shall bear its own legal costs and other expenses in relation to the resolution of a Dispute before the Arbitration Panel.

### 19.4   Continuation of the Contract

While referring to the Arbitration Panel and pending the award of the Arbitration Panel, the Parties agree that they will continue to perform their respective obligations under this Contract, except the obligations the subject of the Dispute.

### 19.5   The award is final and binding on the Parties

The award of the Arbitration Panel shall be final and binding on the Parties. The Parties shall accept and not dispute the enforcement of the arbitral award.

### 19.6   Application to the courts for the enforcement of rights

In order to ensure the enforcement of the arbitration award, a Party may lodge an application to request any court having jurisdiction over another Party or the other Parties or the assets of the same to recognize the legal validity of such award and enforce the award of the

26

Arbitration Panel.

## ARTICLE 20 OTHER PROVISIONS

20.1   This Contract includes the Feasibility Study and the Appendices.

20.2   This Contract shall supersede in all respects all the letters of intention and correspondence, and the previous agreements, commitments and arrangements (if any) between the Parties with regard to the contents of this Contract. If there any inconsistencies between the provisions of this Contract and any provision of the Appendices, then the provisions of this Contract shall prevail.

20.3   The right of any Party to claim sovereign immunity in respect of any arbitral award or judicial action, which may be given or brought against it by or for the benefit of the other Parties, is hereby expressly waived.

20.4   This Contract has been entered into under Vietnamese Law presently in force and the Parties agree that future changes of law should not adversely affect a Party's rights under this Contract. If any Party's economic benefits are adversely and materially affected by the promulgation of any Laws or the amendment or interpretation of existing Laws after the Commencement Date, the Parties shall promptly consult with each other and use their best efforts to implement any adjustments necessary to maintain each Party's economic benefits derived from this Contract on a basis no less favorable than the economic benefits it would have derived if such Laws had not been promulgated or amended or so interpreted.

20.5   The non-performance or delayed performance of any rights and obligations specified in this Contract by each Party shall not mean the waiver of such rights and obligations.

20.6   This Contract shall be able to be supplemented or amended with all Parties agreement in writing signed by the lawful representatives of the Parties to this Contract. If required by law, amendments and additions to this Contract shall be registered with the relevant Vietnamese Government Authority or US Government Authority. Otherwise, this Contract shall not be supplemented or amended without all Parties agreement in writing signed by the lawful representatives of the Parties to this Contract.

20.7   This Contract is made in English and Vietnamese languages, and each version shall be legally equivalent. In the event of any dispute, the English version shall prevail.

20.8   This Contract shall be made in twenty one (21) copies (each copy contains both the English and Vietnamese versions).

This Contract is signed as an agreement by a duly authorized representative of each Party.



29

SIGNED AND SEALED for and on
behalf of **PARTY A** by its authorised
representative:

Dr Nguyen Van Phuong
**Authorised Representative**

SIGNED AND SEALED for and on
behalf of **PARTY B** by its authorised
representative:

Mr Nguyen Duc Ninh
**Authorised Representative**

SIGNED AND SEALED for and on
behalf of **PARTY C** by its authorised
representative:

Ms Tam Mosher
**Authorised Representative**

VNBCCQ14C.DOC

Exhibit B

# SINGAPORE INTERNATIONAL ARBITRATION CENTRE

## NOTICE OF ARBITRATION

### DETAILS OF CLAIMANT

| | |
|---|---|
| Name: | Vietnam Maritime Communication and Electronics Company ("Vishipel") (Point of Contact: Mr. Phan Ngoc Quang, General Director) |
| Address: | No. 2 Nguyen Thuong Hien Str., Minh Khai Ward Hong Bang District Hai Phong City Vietnam |
| Telephone: | +84-31-374-7385 |
| Facsimile: | +84-31-374-7062 |
| Mobile: | +84-903-432-374 |
| Email: | quangpn@vishipel.com.vn |

### DETAILS OF CLAIMANT'S REPRESENTATIVE

| | |
|---|---|
| Name: | Eric Szweda, Troutman Sanders LLP |
| Address: | 34th Floor Two Exchange Square 8 Connaught Place Central Hong Kong |
| Telephone: | +852-2533-7877 |
| Facsimile: | +852-3009-3393 |
| Mobile: | |
| Email: | eric.szweda@troutmansanders.com |

DETAILS OF CLAIMANT'S CO-REPRESENTATIVE

| | |
|---|---|
| Name: | Alexandre Legendre, Leadco |
| Address: | Pacific Place<br>Suite 404<br>83B Ly Thuong Kiet Street<br>Hoan Kiem District<br>Hanoi, Vietnam |
| Telephone: | +84-4-3942-5633 |
| Facsimile: | +84-4-3942-5632 |
| Mobile: | |
| Email: | Alex.lg@leadcolawyers.com |

DETAILS OF RESPONDENT(S)

| | |
|---|---|
| Name: | Universal Telecom Services, Inc. ("UTS")<br>(Point of Contact: Zohar Loshitzer, President and Chief Executive Officer) |
| Address: | 6922 Hollywood Blvd.<br>9th Floor<br>Los Angeles, CA 90028 |
| Telephone: | 888-887-1750 or 323-860-9500 |
| Facsimile: | 323-860-9551 |
| Mobile: | |
| Email: | zohar@uts175.com |

DETAILS OF RESPONDENT(S)

| | |
|---|---|
| Name: | Binh Minh Trading Company Limited |
| Address: | 1 B Binh Minh<br>Pham Ngu Lao Ward<br>Hai Duong City<br>Vietnam |
| Telephone: | +84-320-852615 |

| Facsimile: | +84-320-856378 |
|---|---|
| Mobile: | |
| Email: | |

## DETAILS OF RESPONDENT(S)

| Name: | Orchard Capital Corporation<br>(Point of Contact: Richard S. Ressler, President) |
|---|---|
| Address: | 6922 Hollywood Blvd.<br>9th Floor<br>Los Angeles, CA 90028 |
| Telephone: | 323-860-9550 |
| Facsimile: | 323-860-9551 |
| Mobile: | |
| Email: | |

## DETAILS OF RESPONDENT(S)

| Name: | Richard S. Ressler |
|---|---|
| Address: | 6922 Hollywood Blvd.<br>9th Floor<br>Los Angeles, CA 90028 |
| Telephone: | 323-860-9550 |
| Facsimile: | 323-860-9551 |
| Mobile: | |
| Email: | |

1.  Claimant declares that a dispute has arisen with the Respondent and the dispute is
    governed by the arbitration clause in Article 19 of the Business Cooperation Contract
    attached hereto.

2.  State the general nature and circumstances of the claim and indicate the amount involved:

**Nature of Claim**: The Claimant and Respondents (collectively the "Parties") entered into a
Business Cooperation Contract ("BCC") on December 31, 2000 for the development and
operation of an internet telephony project in Vietnam and the United States. Orchard Capital
Corporation and Richard Ressler guaranteed UTS' legal and financial obligations under the
BCC.

The Parties began operating the project under the BCC in 2004. Until August 2007, UTS
reimbursed Vishipel for costs incurred in connection with the operation of the project in Vietnam
(the "Vietnam Operating Costs"). In January 2008 the Parties agreed to dissolve the project
under the BCC. However, UTS has yet to remit to Vishipel the outstanding balance owed for the
Vietnam Operating Costs, including subsequent interest and penalties for non-payment.
Furthermore, Vishipel has attempted to resolve this dispute with the senior management of UTS
for more than eighteen (18) months. Therefore, Vishipel hereby requests that the Singapore
International Arbitration Centre commence arbitration of this dispute between the Parties.

Amount in Dispute: In excess of US$10,000,000 (U.S. Dollars: Ten Million)

3.  Relief or remedy claimed is:

Monetary damages (including direct and indirect damages), loss of profit, punitive damages,
special damages.

4.  The Claimant has not reached any agreement as to the conduct of the arbitration with the
    Respondent, other than that contained in the Business Cooperation Contract.

5.  Claimant's nomination of arbitrator:

To Be Determined

6.  Per Article 18 of the Business Cooperation Contract, this dispute is governed by the Laws
    of Vietnam and to the extent Vietnam law does not apply, the laws of Singapore shall
    apply.

7.  The language of the arbitration shall be English.

8.  Claimant makes a deposit of the Fees by way of wire transfer:

Wire Transfer MTS Advice No.: 2009072200033386

9.  I hereby file this Notice of Arbitration with the Registrar of the Singapore International Arbitration Centre, with a request that it commences administration of the arbitration.  A copy of this notice is simultaneously being served on the Respondents with notice to respond within fourteen (14) days of receipt of this notice.

Troutman Sanders, LLP

Signature:   _Eric L. Szweda (signature)_

Name:        Eric SZWEDA

Designation: Managing Partner, Hong Kong Office

Date:        July 22, 2009

Leadco

Signature:   _(signature)_

Name:        ALEXANDRE LEGENDRE

Designation: PARTNER

Date:        JULY 22, 2009

Exhibit C

20 April 2010

## SINGAPORE INTERNATIONAL ARBITRATION CENTRE

SIAC Arbitration No. 091 of 2009 (ARB091/09/CV)

<u>Between</u>

Vietnam Maritime Communication and Electronics Company

Claimant

<u>And</u>

Universal Telecom Services, Inc.

First Respondent

Binh Minh Trading Company Ltd.

Second Respondent

Orchard Capital Corporation

Third Respondent

Richard S. Ressler

Fourth Respondent

---

## **<u>STATEMENT OF CLAIM</u>**

---

## I.   **INTRODUCTION**

1.      Claimant Vietnam Maritime Communication and Electronics Company, a state-owned company of the Socialist Republic of Vietnam ("Vishipel"), brings this action to recover damages resulting from Respondents Universal Telecom Services, Inc. ("UTS"), Orchard Capital Corporation ("Orchard") and Richard S. Ressler ("Ressler") (collectively referred to herein as "Respondents") for (i) breach of contract and (ii) conversion of jointly-owned assets.

2.      On 31 December 2000, Vishipel, UTS, and Binh Minh Trading Co. Ltd. ("Binh Minh") entered into a Business Cooperation Contract (the "BCC") to develop, operate and maintain an internet telephony (Voice Over Internet Protocol) network operating between the United States and Vietnam.  Approval of the BCC by the Government of Vietnam was required before operations could commence.  Since UTS was (i) essentially a shell entity and (ii) not a credit-worthy entity with an operating history, approval of the BCC by the Government of Vietnam and ultimately, the Prime Minister of Vietnam, was conditioned on both Orchard and Ressler providing financial assurances that they would guarantee the obligations of UTS under the BCC.  Orchard and Ressler provided such assurances to the Government of Vietnam and Vishipel.  Based on these assurances, the Government of Vietnam approved the BCC.

3.      The BCC provides that UTS will pay the costs incurred by Vishipel in connection with the operation of the project in Vietnam (the "Vietnam Operating Costs" or "VOC").  Despite this contractual requirement (and admonitions from the BCC's accountants and legal advisors), Respondents breached the BCC by failing to pay Vishipel for the VOC.

4.      At all times prior to and after the effective date of the BCC, Respondents had complete control over the BCC assets, including the BCC's bank accounts, books and records.  Respondents abused their position by unlawfully transferring assets from the

- 1 -

BCC's joint bank accounts to themselves and their affiliates for personal use and non-BCC related expenses.

5.     Although the BCC was terminated by mutual agreement of the parties in early 2008, Respondents continue to (i) unlawfully transfer BCC assets to themselves and their affiliates for personal use and non-BCC related expenses and (ii) withdraw funds for fictitious liquidation activities, both resulting in additional damages to Vishipel.  Orchard and Ressler hid these activities from Vishipel through a series of undisclosed related party transactions by utilizing shell companies and by issuing misleading financial statements designed to keep Vishipel unaware of Respondents' actual activities.  As a result of these activities, as described in more detail below, Vishipel has suffered damages of approximately USD $10,000,000.

## II.     **THE PARTIES TO THE ARBITRATION**

6.     Claimant Vishipel is a state-owned company of the Socialist Republic of Vietnam with its principal place of business and headquarters at 2 Nguyen Thuong Hien, Hong Bang, Hai Phong City, Vietnam.

7.     First Respondent UTS is a Florida corporation with its principal place of business and headquarters at 6922 Hollywood Boulevard, Suite 900, Los Angeles, California 90028, United States of America.

8.     Second Respondent Binh Minh is a Vietnamese company with its principal place of business at 1B Binh Minh, Pham Ngu Lao Ward, Hai Duong City, Hai Duong Province, Vietnam, and was a party to the BCC with UTS and Vishipel.[1]

9.     Third Respondent Orchard is a California corporation with its principal place of business and headquarters at 6922 Hollywood Boulevard, Suite 900, Los Angeles, California 90028, United States of America.  Orchard owns and controls UTS and

---

[1]     Vishipel is not alleging any affirmative claims against Binh Minh at the present time. Vishipel reserves its rights to assert claims against Binh Minh later in this proceeding.

guaranteed UTS' obligations under the BCC.  Vishipel will submit to the Tribunal documentary evidence that Orchard guaranteed UTS' obligations under the BCC.

10.     Fourth Respondent Ressler is a resident of the State of California who maintains an office at 6922 Hollywood Boulevard, Suite 900, Los Angeles, California 90028, United States of America.  Ressler is the Chairman and President of UTS and the President of Orchard.  Ressler ultimately owns and controls both Orchard and UTS and guaranteed UTS' obligations under the BCC.  Vishipel will submit to the Tribunal documentary evidence that Ressler personally funded the obligations of Respondents UTS and Binh Minh to the BCC.

## III.    **JURISDICTION AND SUBMISSION TO ARBITRATION**

11.     Section 19.2(a) of the BCC provides:

If the conciliation or negotiation to resolve a dispute fails to be resolved within ninety (90) days of a notice from a Party to any other Party that a Dispute exists discussions (sic), then any party may submit the matter for arbitration in accordance with the rules of UNCITRAL contained in Resolution 31/98 adopted by the United Nations General Assembly on 15 December 1976, which shall be administered by the Singapore International Arbitration Centre ("SIAC").

12.     Extensive negotiations to resolve Vishipel's dispute with Respondents were unsuccessful, and thus, on 23 July 2009, Vishipel filed a Notice of Arbitration with SIAC.

13.     As discussed more fully below, although Orchard and Ressler were not signatories to the BCC itself, they should be required to participate in this arbitration on the grounds that: (1) UTS operated as the alter ego of Orchard and Ressler; (2) Respondents Orchard and Ressler guaranteed UTS' obligations to the BCC and were intimately and personally involved in the establishment and operation of the BCC; and (3) principles of efficiency and economy support resolution of the parties' dispute in a single proceeding to avoid inconsistent rulings and unnecessary expense.

- 3 -

## IV.   STATEMENT OF FACTS

### A.   The Parties Enter Into the BCC

14.     In December 2000, Vishipel, UTS and Binh Minh entered into the BCC for the development and operation of a voice over internet protocol telephony project. The principal activity of the BCC was to establish, operate, and maintain the telephony network to provide telephony services between the United States and Vietnam using advanced satellite data transmission technology. Among other things, under the terms of the BCC (i) Vishipel agreed to apply for the issuance of a license for the establishment and operation of the Project in Vietnam, obtain the necessary approvals of all Vietnamese government agencies, provide sufficient staff to administer and operate the project, and negotiate with Vietnam Post and Telecommunications ("VNPT") for the connection of the Project Network with the VNPT network, (ii) Binh Minh contributed equipment and facilities with a total value of USD $250,000 (which contribution was facilitated by Orchard and Ressler pursuant to an interest-free Equipment Loan Agreement) and (iii) UTS contributed equipment and facilities with a total value of USD $2,250,000, provided resources for the initial set-up, testing and operation of the Project in the U.S. and Vietnam and oversaw the financial management of the BCC.

15.     In December 2000, Vishipel, UTS and Binh Minh filed an application with the Government of Vietnam for approval of the BCC (the "Application"). Because UTS was essentially a shell corporation, the Government of Vietnam and its Ministries required that UTS provide guarantees of its financial viability in connection with the BCC Application. Accordingly, UTS proffered audited financial statements and a series of letters from its parent company, Orchard, and Orchard's principal owner, Ressler, to the Government of Vietnam. The provision of these documents was necessary in order to pass a series of credit checks and financial viability requirements established by the various Vietnamese governmental agencies charged with reviewing and approving the BCC.

- 4 -

16.    Among others, Orchard and Ressler made the following representations to Vishipel and the Government of Vietnam:

(a)    The majority of UTS' shares are held by Orchard and Orchard is the parent corporation of UTS;

(b)    Orchard, *not UTS*, "has cash available to fund the USD $2.5 million investment by UTS in the Vietnam Telephony Project";

(c)    Orchard will guarantee "UTS will meet its obligations" to provide funding in accordance with the provisions of the BCC;

(d)    Ressler is the President of Orchard and the Chairman and President of UTS; and

(e)    At the request of the Government of Vietnam, Ressler submitted a letter from Goldman Sachs stating that his personal accounts contained over USD $50,000,000 and that he has never defaulted on any obligations.

17.    But for these representations by Respondents Orchard and Ressler concerning their financial viability, and without their guarantees on behalf of UTS, the Government of Vietnam, its Ministries charged with oversight of the Project and the Prime Minister would not have approved the BCC. The undertakings by Orchard and Ressler constitute binding and enforceable statutory guarantees under the governing law of the BCC.

**B.     Pursuant to the BCC, the Parties Established the Vietnam Operating Account for the Purpose of Paying the VOC to Vishipel**

18.    Pursuant to the BCC, Vishipel was obligated to pay BCC vendors, suppliers, and other contractors for the VOC, which were defined broadly to include "all actual costs and expenses payable by a Party in connection with the set up, operating and maintenance of the Project network in Vietnam . . . " As such, Vishipel incurred the following VOC on behalf of the BCC:

- 5 -

    **(a)**    **"Termination charges" or "interconnection charges"**:  The per minute fees paid by an operator on whose network a call originates to the operator on whose network the call terminates;

    **(b)**    **Public-Utility Telecommunication Service Fund**:  Service fees that must be paid to the Government of Vietnam to support universal access to telecommunication service;

    **(c)**    **Numeric Warehouse Fee**:  Fees for granting of licenses and allocating and using the store of numbers of the national telecommunication network;

    **(d)**    **Leased Lines:**  The charges for setting up and leasing channels for network interconnections; and

    **(e)**    **Site Rentals**: The charges for renting sites for housing the equipment for the network operation.

19.    Respondents agreed to establish and operate the Vietnam Project Operating Accounts (ostensibly joint bank accounts, although only accessible by UTS) which were to be used for the purpose of paying the VOC incurred by Vishipel.  (BCC, § 8.5(b)).  The BCC required UTS to promptly remit the VOC and Distributable Revenue to Vishipel at the end of each quarter, by transferring the VOC from the US Project Operating Accounts to the Vietnam Project Operating Accounts.  (BCC, § 8.8(c)).

20.    In addition, as part of its obligations under the BCC, UTS was required to "maintain accurate and up-to-date records in relation to the Project Revenue, [VOC] and US Operating Costs throughout the Contract Period."  (BCC, § 8.8(a)).  The BCC further required UTS to provide Vishipel full and complete access to UTS' financial records relating to the BCC upon request from Vishipel.  (BCC, § 8.8(d)).  UTS has never provided Vishipel full access to these financial records and has actively sought to hide its financial activities by, among other things, manipulating financial records provided to Vishipel and by withholding other critical financial records from Vishipel.

21.     Between December 2000 and November 2004, the parties sought approval from the Government of Vietnam to begin operations.

## C.     The Parties Amended the BCC to Ensure that UTS Would Advance the VOC to Vishipel

22.     On 22 November 2004, following receipt of government approval to commence operations, the parties amended the BCC in writing to provide that UTS would advance the VOC to Vishipel on a monthly basis.  Specifically, the parties agreed:

> "[B]y the 15th day of each month, UTS will transfer to Vishipel's bank account the *estimated amount* for lease lines, termination charges and POP location charges of the BCC for the previous month *in order for Vishipel to pay those charges*."
> (emphasis added).

23.     The Vice President of UTS, Kevin Feldman, and Ms. Nguyen Thi Van Anh, UTS' accountant, executed the 22 November 2004 Amendment (the "Amendment") on behalf of UTS.  The Amendment was also signed by two authorized representatives from Vishipel.

24.     Although the Amendment had previously been executed by the parties, Ressler sent a confirmatory letter dated 23 November 2004 recognizing the parties' new understanding regarding payment of the VOC under the BCC.

25.     Ressler sent yet another letter dated 3 December 2004, promising to deliver to Vishipel all "future estimated termination amounts" following receipt of wire instructions, as set forth in his 23 November 2004 letter.

26.     Thereafter, Ressler sent a memo dated 16 February 2005, to all parties to the BCC attempting to unilaterally modify the parties' agreement to advance the VOC by the 15th of each month:

> *Vishipel and UTS have previously agreed on a process and this process will be followed.*  However, it has become apparent that some of our larger and

- 7 -

more important customers are requiring longer payment cycles and therefore *UTS will be forwarding advances for telecom expenses on the 25th of the month* rather than the 15th to accommodate some of these new customers." (emphasis added)

27.     On 18 March 2005, Kevin Feldman, UTS' Vice-President, again confirmed that UTS would *advance* the VOC to Vishipel not later than the 25th of each month.  Mr. Feldman stated:

> [W]e will remit all the money which is due for the prior month within the 25th day of the subsequent month . . . *I am personally assuring you* **that there will not be any excuse whatsoever from UTS in the normal course of business for ever sending the money later than the 25th of the month to pay the undisputed lease line and termination fees.**  (emphasis added)

28.     In accordance with, and immediately following the Amendment, UTS began transmitting payment for the VOC to Vishipel prior to Vishipel's payment of the VOC to the third-party service providers.  For example:

(a)     UTS paid the December 2004 VOC to Vishipel on 19 January 2005;

(b)     UTS paid the January 2005 VOC to Vishipel on 23 February 2005;

(c)     From February 2005 through August 2006, UTS continued to pay the VOC to Vishipel on or near the 25th of each month for the previous month's VOC.

**D.     UTS Breached the BCC By Refusing to Remit Payment to Vishipel for the VOC**

29.     Beginning in September 2006, UTS abruptly stopped its practice of paying the VOC on or before the 25th day of each month as promised.  Vishipel made numerous requests to Respondents to deposit the VOC into the Vietnam Operating Accounts in a

- 8 -

timely manner.  Although Respondents repeatedly reassured Vishipel that they would pay the outstanding invoices, they failed to do so.

30.     During 2007, Vishipel sent demand letters to UTS requesting payment and notifying UTS that its payments were late on over a dozen occasions.  While UTS made sporadic VOC payments, these payments were always several months late and in insufficient amounts.  Thus, the principal outstanding balance of the VOC and interest owed to Vishipel began to mount.  For example, on 15 November 2007, Kim Dang, who worked at Orchard, yet simultaneously represented herself to be a financial analyst for UTS, wrote to Vishipel using an Orchard email account apologizing for the delay and making a *de-minimis* payment for the July 2007 termination fees.

31.     By way of letter dated 20 December 2007 from UTS to Vishipel, UTS first took the position that UTS would reimburse the VOC only *after* Vishipel paid the third party vendors who had provided services to the BCC.  In its letter, UTS ignored the Amendment to the BCC and failed to acknowledge the parties' long-standing custom and practice in which UTS advanced payment of the VOC to Vishipel.

### E.     Unbeknownst to Vishipel, Respondents Convert BCC Funds During the BCC's Operations

32.     In September 2006, UTS' independent auditor, Price Waterhouse Coopers ("PWC"), delivered a Management Letter following completion of their audit of the Report on Implemented Investment Capital and the financial statements of the BCC for the period October 18, 2002 to December 31, 2004 (the "2006 PWC Report").  PWC found significant evidence of improper business practices on the part of UTS, Orchard and Ressler. Prominent among these improprieties was UTS' failure to comply with BCC § 12, which required UTS to advise the other BCC parties of its operating costs within 10 days of the end of each quarter and prepare and deliver quarterly financial statements.

33.     PWC also made a host of other criticisms and suggestions for improvement for the BCC's financial practices.  Among other observations, PWC reported:

a.     *Orchard* (not UTS) awarded USD $1,103,833 in non-bid "consulting agreements" to UTS affiliates for BCC work (USD $158,500 of these costs were for unspecified marketing and promotion);

b.     Improper expenses reimbursed, including several purchases of household items and personal expenses, air travel expenses without invoices, entertainment expenses for which the VAT invoices did not indicate the company's name and VAT code and interest payments to the Ressler on loans provided to related parties;

c.     Expenses amounting to USD $201,740 were recognized in an agreement between UTS and Telecom Assurance (a party related to UTS) without any specific services delineated;

d.     The opening of U.S. Operating Accounts were not approved by the State Bank of Vietnam (a violation of Vietnamese law);

e.     UTS did not deliver timely or complete financial reports to the BCC participants or specify operating costs;

f.     There was no back-up documentation for agreements with customers regarding price adjustments in Fastlink (a telecommunications traffic management software program);

g.     There was a lack of an audit trail with respect to approving and recording payment of expenses by credit card;

h.     Payments made through credit cards for office rental, hotel expenses and traveling expenses, as well as payments for UTS staff, were not supported by invoices or contracts;

i.     A number of expenses were misclassified and incorrectly described in the Quickbook ledger; and

- 10 -

j.      There were inadequate controls over the use of cash.

34.      The response of UTS' management to PWC's findings was that "corrective measures are in the process of being implemented." Respondents' representation to take corrective action never materialized into any remedial measures.

35.      The 2006 PWC Report was only delivered to UTS and was never shown to Vishipel. Indeed, soon after its delivery to UTS, PWC was replaced by Grant Thornton as the BCC's independent auditor. Grant Thornton was directed by UTS and Ressler to restate PWC's findings in a manner designed to hide the financial improprieties and non-compliant accounting procedures from Vishipel.

**F.      The Parties Agreed to an Early Termination of the BCC**

36.      On 16 January 2008, the parties agreed in writing (i) to an early termination of the BCC and (ii) to quickly reduce, and shortly thereafter, eliminate entirely their costs relating to the BCC's operation. Accordingly, the BCC ceased operations on 18 January 2008.

37.      On that same day, Monroe Slavin of Orchard emailed BCC customers from an *Orchard* email address and notified them that UTS (and the BCC) was terminating operation. Mr. Slavin also represented in the email that he was the Controller for UTS.

38.      Final invoices were delivered to the BCC's customers by 21 January 2008. By letter dated 21 January 2008, Vishipel confirmed its agreement with UTS that the BCC would be terminated early and that no further expenses would be incurred by UTS on behalf of the BCC without the express consent of the BCC Liquidation Committee.[2]

39.      As early as 11 December 2007, UTS presented a paper entitled "*Business Co-operation Contract Presentation to the BCC Parties*" in which UTS proposed to accelerate the end date of the BCC to 1 January 2008 and to liquidate the BCC through the Liquidation

---

[2]      Pursuant to the BCC, in the event of early termination, the parties would appoint a Liquidation Committee to wind down the company. (BCC, § 14.3.)

Committee procedures established by the BCC.  In that Presentation, UTS acknowledged

that Vishipel was owed at least USD $5,749,755 upon liquidation.  As a showing of good

faith, Vishipel attempted to finalize the BCC liquidation through the BCC Liquidation

Committee.  However, between January 2008 and October 2008, due to Orchard, UTS and

Ressler's control of the BCC assets, Respondents attempted to dictate the terms and

conditions of the BCC's dissolution to Vishipel.  Respondents withheld the joint BCC funds

as leverage for a full release and discharge of any liability for BCC debts, including the

outstanding VOC.  Respondents indicated that they had no intention of paying Vishipel the

past due VOC or to work with Vishipel on the unwinding of the BCC.  The reasons for

Respondents' behavior soon became apparent to Vishipel.

   40. Respondents' improper conduct was recognized by the BCC's former legal

advisors, Allens Arthur Robinson ("Allens").  In a letter to UTS, dated 19 March 2008,

Allens warned:

> It is illegal for UTS to hold the USD 4 million in its account
> without Vishipel's consent . . . Therefore, by no means can
> UTS have the release from its obligations under the BCC... If
> Vishipel submits a claim to Singapore arbitration, UTS may
> even be subject to adverse arbitral award for not releasing the
> USD4 million in its account...We know that this is a difficult
> situation for UTS... However, we cannot change the law and
> have to advise how the laws may affect UTS.

   41. As in the case of PWC after it delivered the 2006 PWC Report, UTS later

dismissed Allens as counsel to the BCC.

### G. Following the Termination, Respondents Continue to Convert BCC Funds

   42. Following the termination of the BCC, Respondents have continued to

withdraw funds from the BCC accounts to pay unauthorized and non-BCC related fees and

expenses for themselves and their affiliates, even though the BCC is no longer in operation.

The majority of Respondents' expenses paid from the BCC accounts bear no relation to the

BCC and its cessation.  The following examples from the BCC 2008 General Ledger of

- 12 -

Expenses are but a few examples of Respondents' misappropriation of BCC funds.  The full BCC 2008 General Ledger of Expenses will be provided to this Tribunal during these proceedings.

    (a)    On 10 March 2008, UTS paid USD $19,552.50 to a law firm for non-BCC expenses;

    (b)    On 30 March 2008, UTS paid USD $1,622.49 for Zohar Loshitzer's stay in New York City at the Jumeirah Essex House Hotel;

    (c)    On 29 May 2008, UTS paid USD $132.00 for dinner at the Beverly Hills Hotel;

    (d)    On 2 July 2008, UTS paid USD $350.00 to renew Mr. Loshitzer's American Airlines Admiral Club membership;

    (e)    On 9 July 2008, UTS paid USD $80.00 for Mr. Loshitzer's lunch with Jim Greenwood at Iroha Sushi; and

    (f)    On 25 December 2008, UTS paid approximately USD $5,000 to El Al Airlines for airfare to a conference.

43.    Respondents have gone so far as to use BCC monies to establish a laser eye surgery business called Biovision - a project obviously wholly unrelated to the BCC. Examples of BCC assets improperly used for travel expenses associated with the Biovision project *after* termination of the BCC include (but are not limited to):

    (a)    On 19 May 2008, UTS paid USD $2,084.90 to El Al Israel Airlines for Zohar Loshitzer's first-class airfare to Tel Aviv;

    (b)    On 29 May 2008, UTS paid USD $3,601.85 Lufthansa for Mark Yung's first-class airfare to Zurich;

    (c)    On 6 June 2008, Mr. Loshitzer and Mr. Yung each charged the BCC CHF 500 for conference expenses;

    (d)    On 9 June 2008, UTS charged USD $3,162.06 to the BCC for Mr. Loshitzer's first-class flight to Switzerland for a Biovision meeting;

- 13 -

    (e)    On 24 and 25 June 2008, UTS charged USD $1,134.05 to the BCC for meals for its officers at the Restaurant Riveria and Restaurant Haberbueni in Zurich; and

    (f)    On 28 October 2008 UTS charged USD $12,155.15 to the BCC for a travel expense believed to be a conference sponsorship for Biovision.

44.    Although the BCC has not been in operation for a year, and there is no business to manage, UTS has paid itself monthly management fees. UTS has also reimbursed itself for unauthorized "operating expenses" of approximately USD $949,310 during 2009 alone, despite multiple protestations of Vishipel that the BCC project has ended and the remaining funds should be distributed to the project participants. These "BCC expenses" include personal parking spaces, lavish meals and entertainment, first class travel, cash advances from ATMs and other personal expenses such as grocery store bills. In sum, the BCC accounts are being used by Respondents as their personal bank accounts and these unauthorized "operating expenses" continue to be withdrawn by Respondents from BCC accounts on a monthly basis up to and including March 2010.

**H.    <u>As a Result of Respondents' Actions, Vishipel Has Suffered Damages of Approximately USD $10,000,000.</u>**

45.    Vishipel's estimated damages are as follows:

    (a)    2007 and 2008 termination charges of USD $5,967,548;

    (b)    2007 Service Fund of USD $255,000

    (c)    Interest of USD $2,042,098 (interest continues to accrue); and

    (d)    Unauthorized monthly "operating expenses" and other unauthorized non-BCC expenses that have been charged, and continue to be charged, to the BCC for the alleged operation of the BCC long after the BCC has ceased operations, which, to date, total in excess of USD

- 14 -

$949,310.00.

(e)      Numeric Warehouse Fees (for 2008) of USD $31,050.

46.      The above estimated damages do not include monies owed to Vishipel for: (i) leased lines, *i.e.*, the charges for setting up and leasing channels for network interconnections; (ii) charges for renting sites for locating the equipment for the network operation; and (iii) attorneys' fees, accounting firm fees and arbitration costs.

47.      An accounting is required to determine the full extent of the VOC due and owing to Vishipel, as well as the exact amount wrongfully transferred from BCC accounts. The Respondents must fully open their books and records to this Tribunal for the purposes of establishing the full extent of damages. Upon discovery of the activities of Ressler and Orchard in manipulating UTS's accounting procedures and financial statements, Vishipel engaged KPMG to prepare a damage analysis and to study the accounting practices of the BCC parties. KPMG's findings and analysis will be submitted to this Tribunal in connection with the arbitration proceedings.

48.      Under its charter from the Government of Vietnam, Vishipel may be required to report the Respondents' financial transactions to the relevant United States and Vietnamese (i) taxation, (ii) securities regulatory and (iii) Federal and local law enforcement authorities, depending upon the results of KPMG's analysis.

49.      The current amount due and owing to Vishipel totals approximately USD $10,000,000.

## V.      RELEVANT ISSUES AND CONTENTIONS OF LAW

### A.      UTS Breached the BCC By Failing to Pay Vishipel for the VOC

50.      The BCC provides that the laws of Vietnam shall govern the interpretation of the contract, except that to the extent that Vietnam has no relevant law or such law is

- 15 -

ambiguous or unclear, then the laws of Singapore shall apply to any dispute arising out of the contract.  (BCC, § 18.2).

51.     Under Vietnamese law, "a party having a civil obligation must perform such obligation honestly, in a spirit of cooperation, strictly as undertaken, and not contrary to law and social morals."  Vietnam Civil Code (hereinafter "Civ. Code"), Art. 283.  "The time limit for performing a civil obligation shall be as agreed by the parties or as provided by law."  Civ. Code, Art. 285(1).  "An obligation to pay money shall be performed in full, strictly on time, and at the place and the method agreed."  Civ. Code, Art. 290(1).  "The obligation to pay money shall include the payment of interest on principal, unless otherwise agreed."  Civ. Code, Art. 290(2).

52.     "An obligor which fails to perform or performs incorrectly an obligation has civil liability to the obligee."  Civ. Code, Art. 302(1).  Where the payment of money by the obligor is late, the defendant must pay interest.  Civ. Code, Art. 305(2).

53.     As demonstrated in the Statement of Facts above, UTS breached the following provisions of the BCC:

> (a)     § 8.5(b) by failing to establish and operate the Vietnam Project Operating Account for the purpose of paying the VOC;
>
> (b)     § 8.8(c) by failing to deliver its records concerning the VOC and project revenue to Vishipel promptly at the end of each quarter;
>
> (c)     § 8.8(d) by failing to provide Vishipel full and complete access to UTS' financial records relating to the BCC upon request from Vishipel;
>
> (d)     § 8.11(d) by failing to promptly remit the VOC at the end of each quarter;
>
> (e)     § 11(c) by failing to maintain its records in an accurate and complete manner and by failing to deliver a copy of its financial records following the end of each quarter and at the end of each financial

- 16 -

year;

(f) § 12.2(d) by failing to reimburse Vishipel for the VOC prior to the distribution of revenue;

(g) § 12.2(f) by failing to promptly notify the parties that it was challenging Vishipel's claim for payment of the estimated VOC;

(h) By failing to remit payment for the VOC as agreed by the parties pursuant to the Amendment; and

(i) By withdrawing joint BCC funds for unauthorized personal and non-BCC related expenses and failing to properly account for BCC funds.

As a result of these breaches of the BCC, Respondents are liable to Vishipel for damages currently calculated to be approximately USD $10,000,000.

**B.      <u>Respondents Are Liable for Conversion of Funds</u>**

54.      As demonstrated above, since at least 2006, Respondents have improperly siphoned money from the BCC accounts for their own unauthorized purposes. These unauthorized expenses include payments for UTS' attorneys' fees, payments for various dinners, hotels and first class airline tickets, payments for unidentified expenses (including the payment of personal credit card bills and parking expenses), and payments for Orchard's business expenses related to an entirely separate investment. It is Vishipel's intent to demonstrate the full extent of these financial improprieties as part of KPMG's analysis

55.      Furthermore, Respondents have charged (and are continuing to charge) "operating expenses" to the BCC long after the BCC ceased its operations. For example, even though the BCC has ceased operations, UTS continues to charge the BCC a monthly management fee in excess of USD $80,000 for the alleged operation of the BCC claiming that the BCC cannot be completely wound down until a final liquidation agreement is executed. In order to perpetuate their conversion of company funds, Respondents have engaged in evasive tactics to ensure that the liquidation agreement will never be executed.

- 17 -

Since Vishipel has no access to the BCC bank accounts in the United States, it has been powerless to stop these fraudulent and illegal activities.

56.    This continuing conversion of funds has been made without Vishipel's consent and Vishipel has been damaged by these actions in an amount to be proven at trial.

## C.    Orchard and Ressler Are Bound by the BCC's Dispute Resolution Provisions and Required to Participate in this Arbitration

57.    Under Vietnamese, Singaporean and United States federal law, there is ample precedent that non-signatories to an arbitration agreement may be compelled to participate in an arbitration where the agreement was entered into by an agent, or by corporate veil-piercing on the basis of the alter ego principle, or by operation of the doctrine of estoppel. *See* Halsbury's Laws of Singapore, Vol. 2 (LexisNexis, 2003 Reissue), at ¶ 20.020; *see also Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1187-88 (9th Cir. 1986) (holding that non-signatories of arbitration agreements may be bound by the agreement under agency principles); *Prograph Int'l Inc. v. Barhydt*, 928 F. Supp. 983, 990 (N.D. Cal. 1996) ("Agency principles have been held to permit non-signatory corporations to compel arbitration under arbitration clauses signed by their corporate parents, subsidiaries, or affiliates").

### 1.    UTS Is the Alter Ego of Orchard and Ressler

58.    Orchard and Ressler are bound by the BCC's arbitration clause under alter ego and agency theories based on their respective relationships to UTS. UTS, Orchard and Ressler did not differentiate among themselves in their dealings with Vishipel (or third parties), thereby making UTS the alter ego of Orchard, and ultimately Ressler. Orchard and Ressler controlled all UTS functions relevant to its responsibilities under the BCC and, in fact, utilized the corporate form and assets of UTS for their own personal benefit and to the detriment of Vishipel. Consequently, the corporate veil of UTS can and should be pierced

so that Orchard and Ressler may be held accountable for the injuries that their improper conduct caused to Vishipel.

59. During the course of the Respondents' dealings with Vishipel, there was a significant unity of interest between Orchard and Ressler on the one hand, and UTS on the other, such that the separate identities of the parties did not exist. Orchard and Ressler controlled all aspects of the finances, business processes and policies of UTS to such an extent that, for all practical purposes, UTS had no separate identity. Indeed, there are numerous factual examples as to how UTS, Orchard and Ressler commingled assets, operational matters, and personnel such that Vishipel (and third parties, including the Government of Vietnam) had reason to believe these three Respondent parties were one and the same, including but not limited to the following:

(a) Orchard, a private equity group, acknowledged in its letter to the Government of Vietnam that it holds the majority of UTS' shares and that UTS was established solely for the purpose of implementing the BCC;

(b) Orchard and Ressler guaranteed the contractual duties of UTS under the BCC;

(c) UTS and Orchard not only share the same office space in California, but they also share many of the same employees. For example, Vishipel understands that Ressler is UTS' President and Chairman, he owns 70% of UTS and he is Orchard's President and majority shareholder. In addition, Monroe Slavin apparently serves as Orchard's Controller, while simultaneously serving as UTS' Controller;

(d) UTS frequently used an "orchardcapital.com" email address to send correspondence to Vishipel and to BCC customers regarding BCC-related business activities thereby using Orchard's instrumentalities

- 19 -

on behalf of UTS.  For example, Kim Dang, who works as a financial analyst for both Orchard and UTS, frequently sent emails to Vishipel from an Orchard email address while conducting UTS business;

(e)    UTS and Orchard have publicly proclaimed that "[p]art of Orchard Capital's strategy involves taking an active role in the management of its holdings" such as UTS;

(f)    A marketing document dated 9 January 2007 (apparently for presentation to prospective investors) demonstrates that Orchard and UTS were held out as a unified entity with senior officers common to both entities.  The document bears the names and corporate logos of Orchard and UTS on its cover sheet;

(g)    UTS is identified in the 9 January 2007 document as a "Current Portfolio Compan[y]" of Orchard.  Under the heading "Partnering with Vishipel" appears the statement "Orchard Capital and UTS are uniquely positioned to help Vishipel deploy its new licenses."  The 9 January 2007 document further states that "Orchard Capital and UTS is [sic] well positioned to help the Government of Vietnam achieve its privatization objectives within the telecom sector;"

(h)    Four individuals are identified in the 9 January 2007 document as comprising the "UTS Team:"  Richard Ressler as UTS Board Chairman; Zohar Loshitzer as President and CEO; Bob Lehson as CTO and CIO; and Mark Yung as interim CFO and Head of Strategy and Corporate Development.  Three of these four are identified as being affiliated with Orchard:  Ressler as Orchard's founder, Loshitzer as a Principal, and Yung as a member;

(i)    Orchard and Ressler directly communicated with Vishipel regarding payments owed to Vishipel by UTS from joint BCC bank accounts -

- 20 -

the primary issue in this arbitration;

(j)     On the date of the BCC's termination (18 January 2008), Monroe Slavin, ostensibly an employee of Orchard Capital, emailed BCC customers notifying them that UTS was shutting down its operations;

(k)     Orchard employees (rather than UTS) actively assisted Grant Thornton, the BCC's accounting firm, in the preparation of the BCC's 2005 financial statements;

(l)     Both Ressler and Orchard (in their individual capacities) received payments directly from BCC assets: (1) on or about 31 May 2006, Orchard received a payment of USD $500,000 from the BCC to ostensibly reduce the un-recouped capital and interest of UTS (a concept that appears nowhere in the BCC or any subsequent documentation) ; and (2) on or about 20 August 2006, Ressler received a payment of USD $975,000 from the BCC to reduce the balance of an outstanding loan made to Telecom Assurance Corporation (a related party to UTS, Orchard and Ressler); and

(m)     Vishipel will proffer additional direct evidence proving that UTS, Orchard and Ressler conspired to loot the joint bank accounts of the BCC and improperly used substantial funds from the joint accounts to pay for personal expenses and unrelated business activities, and otherwise disregarded the corporate structure of UTS, treating its assets and property as their own.

For the above reasons, and for reasons that will be more fully explored through the production of documents and through witness testimony, Vishipel will demonstrate that UTS is the alter ego of Ressler and Orchard, such that the corporate veil of UTS should be pierced, and therefore that Ressler and Orchard are rightfully parties to this arbitration who should be held accountable for the injuries they caused to Vishipel.

2. **As Guarantors of UTS' Financial Obligations under the BCC, and As Indispensable Parties to the BCC's Formation, Orchard and Ressler Are Bound by the BCC's Arbitration Provision**

60.     Based upon the laws of Vietnam, as well as well-recognized authorities on international arbitration, Orchard and Ressler submitted to the jurisdiction of SIAC and are proper parties to this arbitration.  Non-signatories to a contract containing an arbitration clause may be bound to arbitration if: (1) they were involved in the performance of the contract; (2) have an interest in the arbitration as beneficiaries; or (3) as parties whose liability might be affected by the arbitration.  *See* Edmonson, Larry, Domke, *On Commercial Arbitration*, § 13:1 (3rd Ed. 2009).

61.     Orchard's and Ressler's conduct in the formation and execution of the BCC constitute binding and enforceable statutory guaranties under the laws of Vietnam.

62.     For example, based on UTS' incorporation in the United States for the purpose of entering into the BCC, Vietnam's Ministry of Planning and Investment ("MPI") several times requested that the parties supplement the Application for a business license to provide further support of UTS' financial capability, including documentation from UTS' parent company, Orchard, evidencing its support of UTS.

63.     Vishipel, on behalf of the BCC Parties, responded to MPI's request and explained that UTS' financial capacity was dependent on Orchard, UTS' parent company, and Ressler, who Vishipel understands (i) is the President and largest shareholder of Orchard; and (ii) UTS' President, Chairman and the owner of at least 70% of UTS' shares. Specifically, the BCC parties explained that UTS "is a subsidiary company of Orchard Capital Corporation, established to implement the [BCC] Project."  The BCC parties further explained that "*UTS's financial capacity is demonstrated in details through the following documents:*"

(a)     "[L]etter by Goldman, Sachs & Co [confirming] Mr. Richard S. Ressler's account having over USD 50 million"; and

- 22 -

(b)   "[L]etter by Mr. Richard S. Ressler (President of Orchard and UTS) [concerning] UTS's financial capacity, committing that Orchard puts aside USD 2.5 million available for UTS's investment in the [BCC] to implement the . . . Project in Vietnam . . ."

64.   Copies of the above-referenced letters were provided to MPI in connection with the Application.  The second letter, which was submitted on Orchard letterhead, specifically stated that: (1) "[a] majority of the issued share capital of UTS is held by the affiliated group of Orchard Capital Corporation;" (2) Orchard's combined market capitalization is "in excess of US$200,000,000;" and (3) Orchard, *not UTS*, had the "cash available to fund the US$2.5 million investment by UTS in the Vietnam Telephony Project," thus, making Orchard, rather than UTS, the actual foreign investor in the BCC.

65.   In addition, the parties also provided Orchard's financial statements as an exhibit to the revised Application as required by MPI.  The supplemental information in support of the Application was also provided to the Prime Minister of Vietnam, whose approval and signature was required in order to grant the investment license to the BCC Parties.

66.   At the time of these representations, Orchard and Ressler were both aware that: (i) the BCC contained the SIAC arbitration clause; and (ii) without the representations to the Government of Vietnam that they financially guaranteed UTS' obligations under the BCC, the Government of Vietnam would not issue the Investment License, the Prime Minister of Vietnam would not approve the arrangement and the BCC would be inoperative.  Accordingly, as guarantors of UTS' obligations under the BCC (these assurances constitute statutory guarantees under the laws of Vietnam), Orchard and Ressler have agreed to SIAC's authority to adjudicate this matter.

- 23 -

### 3. Orchard and Ressler Should Be Required to Participate in this Arbitration on Grounds of Economy and Efficiency

67.     Vishipel's claims against Ressler and Orchard for breach of contract, for failure to guarantee the financial obligations of UTS, and for conversion of BCC funds are inextricably intertwined with the claims Vishipel has against UTS. Indeed, the party acting on behalf of UTS has historically been an Orchard representative or Ressler himself.

68.     In the interests of efficiency, judicial economy, the parties' financial resources, and to avoid the possibility of inconsistent rulings, Vishipel's claims against Ressler and Orchard should be heard at the same time and in the same forum as its claims against UTS, the alter ego of Ressler and Orchard. UTS, Orchard, Ressler and their affiliated entities engaged in a series of intertwined inter- and intra-company transactions (including but not limited to the transactions described above) that would make the separate adjudication of claims inefficient and unjust to Vishipel.

## VI.   RELIEF SOUGHT AND QUANTIFIABLE DAMAGES

69.     To date, UTS has not paid Vishipel the VOC that Vishipel incurred on behalf of the BCC. Vishipel further seeks an accounting of the funds held by UTS, Orchard, and Ressler concerning the Project, and the disgorgement of funds improperly withdrawn from the BCC accounts.

70.     Vishipel's damages are as follows: (1) Termination charges of USD $5,967,548; (2) Service Fund of USD $255,000; (3) Interest to date of USD $2,042,098; (4) Numeric Warehouse Fees of USD $31,050 and (5) "operating expenses" for 2009 and 2010 that have been charged, and continue to be charged, to the BCC for the alleged operation of the BCC long after the BCC has ceased operations (which expenses include the substantial amounts charged to the BCC for the personal expenses of Respondents) which, to date, total approximately USD $949,310. These damages do not include monies owed by Vishipel for: (i) leased lines, *i.e.*, the charges for setting up and leasing channels for network

- 24 -

interconnections; (ii) charges for renting sites for locating the equipment for the network operation and (iii) attorneys' fees, accounting firm fees and arbitration costs.  The current amount due and owing to Vishipel totals approximately USD $10,000,000, the precise calculation to be proven in these proceedings.

**[Remainder of page left blank intentionally. Signature page follows.]**

Ex. C, Pg. 70

Dated: 20 April 2010

Respectfully submitted,

TROUTMAN SANDERS LLP

By:_____
    Jeff M. Cohen, Partner
    Monique M. Fuentes, Partner

LEADCO LEGAL COUNSEL

By:_____
    Alexander G. Legendre, Partner
    Vu Thuy Hang, Associate

*Attorneys for Claimant*
*Vietnam Maritime Communication and*
*Electronics Company*

1124815v1